

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| SCOTT LOUIS PANETTI,<br>Petitioner | §<br>§ |
| | § |
| V. | § |
| | § |
| DOUG DRETKE, Director, | § |
| Texas Department of Criminal | § |
| Justice, Institutional Division, | § |
| Respondent. | § |

CASE NO. _____

## PETITION FOR WRIT OF HABEAS CORPUS
## RAISING RIPE CLAIM OF INCOMPETENCY TO BE EXECUTED
## UNDER <u>FORD v. WAINWRIGHT</u>

### THIS IS A DEATH PENALTY CASE.
### SCOTT LOUIS PANETTI IS SCHEDULED TO BE EXECUTED ON
### FEBRUARY 5, 2003 AFTER 6:00 P.M.

MICHAEL C. GROSS
State Bar No. 08534480
106 South St. Mary's Street, Suite 260
San Antonio, Texas 78205
(210) 354-1919
(210) 354-1920 Fax

Attorney for the Petitioner,
SCOTT LOUIS PANETTI

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **SCOTT LOUIS PANETTI,** | § | |
| **Petitioner** | § | |
| | § | |
| **V.** | § | **CASE NO. _____** |
| | § | |
| **DOUG DRETKE, Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Institutional Division,** | § | |
| **Respondent.** | § | |

**PETITION FOR WRIT OF HABEAS CORPUS
RAISING RIPE CLAIM OF INCOMPETENCY TO BE EXECUTED
UNDER <u>FORD v. WAINWRIGHT</u>**

This case concerns the proper protection of fundamental rights when the State prepares to take drastic action against an individual.  In refusing to appoint an independent mental health expert to examine the Petitioner for competency to be executed and hold a hearing, the state court made a decision that deprived him of the one fundamental requisite of due process – "the opportunity to be heard."  <u>Grannis v. Ordean,</u> 234 U.S. 385, 394 (1914).  In <u>Ford v. Wainwright,</u> 477 U.S. 399 (1986), the Supreme Court held that "the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane."  <u>Id.</u> at 409-10.  The state court unconstitutionally increased Mr. Panetti's threshold burden to proceed on his <u>Ford</u> claim by denying Mr  Panetti a current mental health expert to conduct a current evaluation since the last evaluation was conducted at TDC in 1997 during the state habeas.  Therefore, the state court's adjudication of his competency-to-be-executed claim "resulted in a decision that was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States" in both <u>Ford v. Wainwright</u> and <u>Stewart v. Martinez-</u>

Villareal, 523 U.S. 637 (1998). See 28 U.S.C. § 2254(d)(1). Accordingly, Mr. Panetti is entitled to de novo merits review of his Ford claim. The evidence counsel has presented clearly satisfies the threshold burden that triggers the appointment of mental health experts and a hearing necessary to make a reliable determination of Mr. Panetti's present competency to be executed.

## PROCEDURAL HISTORY OF THE FORD CLAIM

Mr. Panetti was charged in the 216th Judicial District Court of Gillespie County, Texas with capital murder occurring on September 8, 1992. (T - 2).[1] A competency trial was held on July 28-29, 1994 resulting in a mistrial from a hung jury. Id. at 28. A second competency trial was held on September 8-9, 1994 resulting in a finding of competency. Id. The jury trial began on September 8, 1995 with Mr. Panetti proceeding pro se with standby counsel. Id. at 11. On September 21, 1995, the jury found Mr. Panetti guilty, contrary to his plea, and on September 22, 1995, the trial judge sentenced him to death. Id. at 10.

The Texas Court of Criminal Appeals on direct appeal affirmed the conviction on December 3, 1997. Panetti v. State, No. 72230 (Tex. Crim. App., December 3, 1997). The Supreme Court of the United States denied the petition for a writ of certiorari on October 5, 1998. Panetti v. Texas, No. 97-9393 (1998). A state application for writ of habeas corpus was filed on June 19, 1997 and was denied by the Texas Court of Criminal Appeals on May 20, 1998 without a hearing having been held in the state court. Ex parte Panetti, No. 37145-01 (Tex. Crim. App., May 20, 1998).

A petition for writ of habeas corpus was filed on September 7, 1999 in the United States District Court for the Western District of Texas and was denied without a hearing on March 8, 2001.

--------

[1]The clerk's record regarding the Motion to Determine Competency will be referred to as "T and page number."

Panetti v. Johnson, Cause No. A-99-CA-260 (W.D. Tex. 2001). The Fifth Circuit Court of Appeals affirmed the denial of the habeas petition on June 19, 2003. Panetti v. Cockrell, No. 01-50347 (5th Cir. 2003). The Supreme Court of the United States denied the petition for a writ of certiorari on December 1, 2003. Panetti v. Dretke, No. 03-6475 (2003).

On October 31, 2003, an Order Setting Execution was signed by the trial judge setting the execution for February 5, 2004 after 6:00 p.m. (T - 20-21). On December 9, 2003, a Motion to Determine Competency to be Executed was mailed for filing on behalf of Mr. Panetti with the trial court. Id. at 25-65. This motion requested the trial judge conduct a hearing to determine the competency of Scott to be executed, to appoint counsel to prepare for and represent Scott at the competency hearing, and to grant funds to enable Scott to hire a mental health expert to prepare for the competency hearing. Id. at 25. The trial court denied this motion without a hearing on December 23, 2003. Id. at 66.

## JURISDICTION

Because this Ford claim is now ripe give the fact that an execution date has been set, the Court has proper jurisdiction over this matter, and no motion for authorization to file a successive petition is required from the Fifth Circuit under 28 U.S.C. § 2244(b)(3)(A). See Stewart v. Martinez-Villareal, 523 U.S. 637 (1998); Richardson v. Johnson, 256 F.3d 257 (5th Cir. 2001); In re Davis, 121 F.3d 952 (5th Cir. 1997).

## CLAIM FOR RELIEF

## SCOTT PANETTI IS INCOMPETENT TO BE EXECUTED.

Proceeding with the execution of Scott Panetti on February 5, 2004, will violate the Eighth and Fourteenth Amendments and the Supreme Court's decision in Ford v. Wainwright, 477 U.S. 399

(1986), because he is incompetent to be executed. In <u>Ford</u>, the Supreme Court held that "[t]he Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane." <u>Id.</u> at 410. In a concurring opinion, Justice Powell concluded that the State may not constitutionally execute those who, because of mental illness, do not rationally understand "the fact of their impending execution and the reason for it." <u>Id.</u> at 422 (Powell, J., concurring). <u>Ford</u> recognizes the extreme "inhumanity and cruelty" of executing a man "who has no comprehension of why he has been singled out and stripped of his fundamental right to life" and "has no capacity to come to grips with his own conscience or deity." <u>Id.</u> at 409. Justice Powell explained that:

> [O]ne of the death penalty's critical justifications, its retributive force, depends on the defendant's awareness of the penalty's existence and purpose. Thus, it remains true that executions of the insane both impose a uniquely cruel penalty and are inconsistent with one of the chief purposes of executions generally.
>
> \* \* \* \*
>
> If the defendant perceives the connection between his crime and his punishment, the retributive goal of the criminal law is satisfied. And only if the defendant is aware that his death is approaching can he prepare himself for his passing. Accordingly, I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it.

<u>Id.</u> at 422-23 (Powell, J., concurring). Mr. Panetti's severe mental illness has rendered him unaware of his impending execution and the reasons why he is about to be executed.

## A.    THE EVIDENCE OF MR. PANETTI'S INCOMPETENCY

More than eleven years before the capital murder charges in the case at bar, the Petitioner, Scott Panetti, had an extensive and continuing history of severe mental illness including schizophrenia, manic depression, auditory hallucinations, and persecutory delusions. (T - 60-65). Scott was hospitalized for mental illness fourteen times in six different hospitals until his arrest for

capital murder in this case in 1992. Id. Scott was involuntarily committed to the Kerrville State Hospital in January 1981. Id. He was diagnosed as paranoid and hostile toward his family. Id.

Scott was admitted to the Starlite Village Hospital in April 1986 and diagnosed with schizophrenia and had a history of speaking incoherently and paranoia. Id. Scott claimed he killed the devil and exorcized his home Id. Scott was actively hallucinating. Id. Scott was transferred to the Kerrville State Hospital in May 1986 for further evaluation and was diagnosed with paranoia and schizophrenia since Scott had buried some of the furniture from his family home because of his belief that the devil was in the furniture and because he had nailed his curtains shut. Id. Scott was transferred to the Waco Veteran's Hospital in May 1986 and was again diagnosed with schizophrenia. Id.

Scott moved to Wisconsin and was admitted to the Tomah Veteran's Hospital in July 1986 and was again diagnosed with schizophrenia. Id. Scott was transferred to Cumberland Memorial Hospital and was diagnosed with depression, brain dysfunction, delusions, auditory hallucinations, and homicidal ideation toward his family. Id. Scott was transferred to Northern Pines Unified Services Center in August 1986 and was diagnosed with depression and suicidal ideation. Id. Scott had hallucinations where he saw the devil on the wall so he killed the devil and saw blood come out of the walls so he washed the walls. Id. He washed his house to get rid of the devil. Id. Scott felt that the devil was after him. Id. Scott appeared to be on the edge of a psychotic break. Id. Scott was concerned about ideas that he might hurt his family. Id.

Upon his return to Texas, Scott was again hospitalized at Starlite Village in October 1986 since he was psychotic and he was again diagnosed with schizophrenia. Id. Scott was transferred

to the Kerrville Veterans Hospital in November 1986 and was again diagnosed with schizoaffective disorder. Id.

In 1990, Scott was involuntarily committed at the Kerrville State Hospital for homicidal behavior since he had threatened to kill his wife, baby, father-in-law, and himself. Id. Scott also believed that there was a plot against him by the citizens of Kerrville, Texas. Id. Scott was admitted to the Kerrville Veterans Hospital in 1992 and diagnosed with schioaffective disorder and with possibly three personalities and he had again threatened his family. Id. As late as March 1995, Scott was showing evidence of thought disorders and disorganization of his thought processes. Id.

In the midst of these severe mental illnesses, Scott was having marital problems with his wife in August 1992 resulting in their separation. (R - v.31 - 60).[2] Scott's wife was living with her parents. Id. at 61. On September 8, 1992, Scott sawed off the barrel of his shotgun, shaved his head, dressed in Army fatigues, and went to the residence of his parents-in-law. Id. at 66-73. Scott's wife was awakened early in the morning by Scott entering her parents' home. Id. at 68, 73. Scott shot open the door and entered the house Id. at 74-75. Scott then shot the wife's parents. Id. at 84, 91. Scott then took his wife and child to his bunkhouse. Id. When the police surrounded his bunkhouse, Scott changed into a suit and surrendered to the police. Id.

Two competency trials were held at the trial level. The first competency trial resulted in a hung jury. (R - v.10 - 379). At the second competency hearing, the following testimony occurred. Mosty testified he had been representing Scott in this case since being appointed in September 1992. (R - v.13 - 24). He testified that a capital murder trial is an extremely stressful situation for an

---

[2]The reporter's record from trial will be referred to as "R and volume and page number." The medical records of the Appellant were admitted at the second competency hearing as State Exhibits 1 through 6.

accused.  Id.  Mosty testified that under stress Scott would become delusional and nonresponsive to questions after being, for instance, moved from jail to jail or to the courtroom for a proceeding.  Id. at 27.  It was typical during conversations for Scott to state he felt possessed by demons and had been visited in his jail by angels and Jesus.  Id. at 29-31.  Mosty testified that Scott's medical records document that Scott had four or five personalities in him dating back to the mid-1980's  Id. at 31. Mosty testified that he could not have a meaningful conversation with Scott about the case, that Scott was unable to consult with counsel with a reasonable degree of rational understanding and did not have a rational understanding of the proceedings.  Id. at 34-35, 43.

Dr. Coons testified that he is a forensic psychiatrist and had conducted approximately five thousand competency evaluations.  Id. at 56.  He performed a competency evaluation on Scott.  Id. at 59.  Coons testified that Scott did not have sufficient present ability to consult with counsel with a reasonable degree of rational understanding and did not have a rational or factual understanding of the proceedings.  Id. at 60-61.  His findings were that since 1986 Scott, under stress, decompensates causing his mental abilities to become inefficient.  Id. at 61-62.

Dr. Simes claimed he saw Scott for evaluation on three separate days and concluded Scott was mentally ill and at times rambled during conversations.  Id. at 134, 137, 144.  Simes felt at a disadvantage since he did not evaluate Scott as a patient, but he still felt that schizophrenia was an accurate diagnosis of Scott.  Id at 145.  Simes claimed, however, that Scott could still consult with counsel with a reasonable degree of rational understanding and that Scott had a rational and factual understanding of the proceedings against him.  Id. at 146.  Simes claimed he had difficulty making these determinations.  Id. at 147.

Simes never asked Scott about the demons but remembered Scott's delusional, nonrational thinking about "gold dust coming down and spiritually filling [Scott]." Id. at 153-154. Simes remembered Scott's delusional thoughts about his four personalities inside him and about Scott thinking the competency trial was to get him proper medications. Id. at 154-156. Simes agreed that when Simes asked Scott about the role of his lawyers, Scott never gave a rational response and never identified Mosty as a lawyer. Id at 159, 161. Simes agreed that Scott irrationally described the court proceedings as a chess game. Id at 162. Simes agreed that when he testified at the first competency hearing he stated Scott claimed the President of the United States was Ford or Nixon but at the second competency hearing Simes could not remember this. Id. at 165-166.

Simes agreed that stress exacerbates schizophrenia and that being in a courtroom situation is stressful. Id. at 163. Simes agreed that Scott's delusions could make Scott incapable of assisting his attorneys. Id. at 172. Simes stated that his opinion was based on Scott on the day Simes met with Scott and Simes "would be concerned about [Scott's] mental health over any six-week duration of time." Id. Simes agreed that as the capital murder trial progressed and the stress increased, it was "quite possible" that the schizophrenic Scott would decompensate. Id. at 173-174. Scott was found competent.

After the results of the second competency hearing, Scott requested that he be allowed to proceed pro se and signed a Voluntary Waiver of Counsel. (R - v.15 - 5). Scott's attorneys told the judge that they did not feel Scott was competent to stand trial, did not understand the process, and should not represent himself. Id at 12-13. The state objected to allowing Scott's attorneys to withdraw from the case. Id. at 24 The judge asked Scott why he wanted to represent himself and not have a lawyer represent him and Scott responded:

> Sir, the reason I want to represent myself is because under the laws of the State of Texas and under the United States Constitution I have the right to do so. I am fully aware of the penalty for charges that I have been charged, what I have been charged with. I do, however, feel that in the press in the place of venue where I'm not being looked upon quite possibly as United States Navy Seal swim and scuba team, Your Honor, and I don't want to be confused here, sir, but I also must ask that my sanity and that my competency be taken seriously, sir, as decided by a jury in the State of Texas, and I find while being advised I will be treated fairly and the same, that I am, in fact, not, and I would hope that from now on that I would be looked upon as sane, not without mental illness, but sane and competent to defend myself in the court of law in the great State of Texas, Your Honor.

Id. at 19. Scott's plea at trial on the merits was not guilty by reason of insanity. (R - v.31 - 24).

When asked if he understood the gravity of the situation and the potential consequences, Scott stated:

> Sir, my understanding is finine [sic]. I cannot begin to explain or understand with my finite mind the infinite power of the God that gave me the healing, the courage, the confidence, the bold, and in First Peter 55, the humble. To answer your question with a simple three-letter word .   .

(R - v.15 - 27).

When asked by the judge if his request to represent himself was voluntary, Scott responded:

> Your Honor, I can't help but bring up - I will not go on with a chronology in a sense, but I cannot help but bring up the newspapers, hearsay, scuttlebutt, everything that goes along with a case of the seriousness and magnitude. I find it perplexing, to use a proper word, that in certain decisions I have been informed of in the Court I find however legally - however legal and proper, that I find quite unorthodox. I must reiterate my confidence in myself and my Lord and Savior, Jesus Christ, and he lets me know in my heart and in my mind, with all due respect, Your Honor, that this is in the best interest of Scott L Ranahan Panetti, AKA Wounded Sunbird, formerly He Who Never Cries. The other names, Your Honor, will be brought up after I have this expert let me know if I have, indeed, any telltale signs of other personalities, for the Court's benefit, the jury's benefit, my

family's benefit, but in the sincerity of my healing in my heart is sincere, sir, and I believe in it, I'm not asking you to notice the physical changes, the mental changes. I'm just asking, as I did before, with a bit of patience, because I'm not afraid and I'm not intimidated by a bunch of law books. The law is simple common sense and just like in this book, by some it's made complicated. I think it gets right down to common sense, Your Honor, and I have confidence in my studies and I will be able to properly litigate. Thank you, sir.

Id. at 26. The judge allowed counsel to withdraw from the case. Id. at 29

As an example of the manner in which Scott's mental processes operated during trial on the

merits, the general voir dire by Scott went, in part, as follows:

COURT: Mr. Panetti, would you like to make some general statements?

PANETTI: Yes, Your Honor. I thank you all for showing up. It's your duty to do so I would do the same. A couple of people here might just be spectators Chris Hardy, what's your business here, sir?

* * *

PANETTI: I just ask -- there's a horseshoer from Fredericksburg. He is a wrestler and I know from the past and he got to town years ago. He asked me on the phone if I would work with him. I just wanted to ask him what are you here for, Chris? Are you just here to watch?

HARDY: Just here

PANETTI: Well, you're welcome, and, Mr. Heirholzer, you're an officer of the law

HIERHOLZER: Yes, sir.

PANETTI We had some hippies worked on the ranches that would laugh, but had a little fear of Officer Hierholzer. I didn't know who he was, but I heard his reputation until he served some papers on me and he's welcome. too. One of those old hippies died from an overdose of Schlitz beer and he did his share of drugs and - but mainly it was the beer. and I'm a recovering alcoholic and I haven't had a drink - will be three years September 8th. I have some real strong

religious book convictions, but I'm not a Bible-beating preacher and if y'all wish to take a drink or smoke a joint or do whatever you did in moderation and you didn't have a problem with it, I wouldn't see no problem with that the day before.  I would like you to be here sober.

\* \* \*

Says now the Sheriff was out of Fredericksburg for years and I by no means am going to tell you I got drunk and did this, because I wasn't drunk, but I had the choice of eating my steak with my $12 and I chose to go to the liquor store and so the day before I drank and there's probably telltale effects in my system and before that I had a year's sobriety.  When I -- in a small town when I saw the Sheriff and his cronies in the Andy's Diner, it did sort of help me make my mind up to take a left turn instead of a right, so a lot of things that were wrote about me or said about me -- and there's one lady here that says she knows me or knows my ex-wife.  Well, that's fine.  I went ahead and subpoenaed my ex-wife, because for years I didn't know I was schizophrenic.

\* \* \*

And I don't want you to think that because I'm an alcoholic, that I think y'all should have a cocktail or smoke marijuana or do anything.  My thousand days of or thirty-five months I was locked up in Waco Branch Davidian's expert cell and they call him expert, because he was the gunsmith and he got thirty-five years' federal time, which means he's going to do it all.   Some of the ladies got eight years' apiece.  I mean, the law that said I'm not an expert, and I'm not, either, but while I was locked up in that cell I had a gay fellow who before then I wouldn't have called him gay, throw body fluids on me; so in a sense as far as court goes, yeah, I have suffered some, but myself being innocent or even the victims' innocence, I'm not going to get into that, but I will say that we had our beliefs as everlasting life.

\* \* \*

I don't know if your name is Jehovah.  Jehovah is a name for God and I really don't know the beliefs of Jesus.  I was in Kingdom Hall and had some friends that lived up in Alamo Springs that came and visited me.

* * *

Today is August 22nd and this our daily bread.  I think it's a Baptist.  It's Protestant.  I was baptized in '66, Presbyterian, and the last year in Bell County . . .

* * *

Be killed, power line, when I was a kid.  I've got my Injun beliefs as a shaman.  I sent the buffalo horn to my sister.  Adjustment, Jesus wrote.

(R - v.21 - 63-89).

During trial, the rule was not invoked, so all witnesses sat in the courtroom.  (R - v.3 - 315-316).  One of the witnesses, Dr. Seale, provided an affidavit for the writ proceedings which was used in support of the Motion to Determine Competency to be Executed.  (T - 44-45).  He had been treating Scott at Starlight Village since 1986.  Id.  He watched Scott for an entire day in the courtroom.  Id.  Dr. Seale saw Scott ask questions of witnesses, give testimony, and argue with the prosecutor.  Id.  Dr. Seale observed that Scott's actions were part of Scott's delusion.  Id.  Dr. Seale had no doubt in his mind that Scott was so mentally ill that he was incompetent to stand trial.  Id.  Dr. Seale thought that it was immoral to have such an incompetent person stand trial let alone represent himself.  Id.  Dr. Seale thought that the trial judge should have stopped the trial and had a psychiatric evaluation of Scott.  Id.  Dr. Seale thought, "My God.  How in the world can our legal system allow an insane man to defend himself?  How can this be just?"  Id.

Another witness, Dr. Selck, provided an affidavit for the writ proceedings which was used in support of the Motion to Determine Competency to be Executed.  (T - 46-51).  He had also been treating Scott at Starlight Village and also saw Scott in the courtroom for an entire day.  Id.  Dr.

Selck observed Scott rambling in his speech and unable to think clearly or understand what information was important at trial.  Id.  Scott was loud in his speech and walked around the courtroom in an inappropriate manner.  Id.  Scott's actions and speech had an obvious effect on the jury.  Id.  The jury appeared antagonized by Scott's insane verbal rambling and actions.  Id.  The jury had hostile stares and looked at Scott in disbelief during his ramblings.  Id.  It was clear to Dr. Selck that Scott's mental illness prevented Scott from representing himself and adversely affected the jury.  Id.  This adverse effect was supplemented by the presence of a law enforcement officer on each side of Scott wherever Scott went in the courtroom.  Id.  There is no question on the part of Dr. Selck that Scott was incompetent at trial.  Id.

During trial, the dress of Scott also revealed his severe mental illness.  Scott's standby counsel, Scott Monroe, provided an affidavit stating that during trial Scott dressed in a "Tom Mix" style costume like an old TV western.  (T - 52-58).  Scott wore his hat in court.  Id.  He had pants that looked like leather suede tucked into his cowboy boots.  Id.  He wore a cowboy style shirt with a bandana.  Id.  The shirt was the double fold over type western shirt.  Id.  One shirt was a green color, the other was burgundy.  Id.  Scott wore a big cowboy hat that hung on a string over his back.  Id.  It was out of a dime store novel.  Id.  Scott constantly used an old west vernacular in his speech.  Id.  He used words like "bronc steer," "run away mule," and "shoe the bosses' hosses."  Id.

A psychiatrist, Michael R. Arambula, provided a psychiatric evaluation of Scott in 1997.  (T - 59-65).  Dr. Arambula reviewed Scott's medical records from the Kerrville State Hospital, Starlite Village, Waco Veterans Administration Hospital, Tomah Veterans Administration Hospital, Northern Pines Unified Services, Cumberland Memorial Hospital, Kerrville Outpatient Clinic, Texas Department of Corrections, Bell County Jail, Fredericksburg Police Department, and the record of

trial. Id. Scott had a religious experience on April 1, 1995 and gave up taking his medications. Id. Dr. Arambula stated that Scott suffers from schizoaffective disorder which is a combination of schizophrenia and manic depression (bipolar disorder). Id. Dr. Arambula stated that schizophrenia is a chronic disease which almost always has some degree of activity throughout a person's life once they contract this disease. Id. Dr. Arambula stated that records subsequent to 1995 reveal that Scott "was showing evidence of looseness of associations (thought disorder), clang speech (manic symptom), and disorganization of his thought processes." Id. at 60-61. "Further, records indicated Mr. Panetti was hallucinating and becoming more delusional." Id. at 61. During his interview with Scott at TDC, Scott told Dr. Arambula that "his mission here was to withstand persecution because man could not execute a sacred Nazareth." Id. at 62. Dr. Arambula described Scott during the 1997 TDC interview as follows:

> Mr. Panetti was dressed in TDC attire. He had a long straggly beard and was disheveled. He had some eye contact with this examiner, and when present, was quite an intense stare. He was very suspicious and guarded. He was irritable and extremely religious, to the point it was difficult to understand his thought content. At times, when it was only he and I that were in the room, he stopped speaking as if he heard someone else talk to him. He spoke rapidly and with pressured speech, such that I had to interrupt him several times in order to carry on a conversation with him or keep him on track. Otherwise, he verbalized at length about nothing. He exhibited severe flight of ideas, jumping from subject to subject to subject with little cohesion. He showed tangentiality to my questions, giving a statement (answering) to my question that was totally irrelevant. At times when he began a statement (answer) that was appropriate to my question, he went off onto a tangent that was similarly unrelated. Mr. Panetti was extremely circumstantial, giving so many extraneous details that it was difficult to assess the core theme or content of his statements. He was restless and hyperactive. He was very egocentric, to the point that he was delusional in a grandiose way (believing he was a messiah of some sort). He had very little expression on his face except for an occasional smile that was inappropriately related to what

> he was speaking about. He often spoke with clang speech, rhyming his responses to whatever words I had used or to the last word he had used. He was also perseverative, in the sense that he would repeat a word or phrase or my own several times without reason. He had no insight into his condition. His mood was manic. His intellectual functioning was very difficult to assess, based upon his degree of incoherence and lack of logic.

Id. at 62.

## B.   BY HOLDING MR. PANETTI TO A HIGHER THRESHOLD BURDEN THAN THAT PERMITTED UNDER FORD, THE STATE COURT'S DECISION DENYING HIS CLAIM WAS CONTRARY TO CLEARLY ESTABLISHED FEDERAL LAW.

On December 9, 2003, Mr. Panetti's counsel filed a motion under Article 46.05 of the Texas

Code of Criminal Procedure to determine Mr. Panetti's competency to be executed. The relevant

portion of Article 46.05 states that:

> (d)   On receipt of a motion filed under this article, the trial court shall determine whether the defendant has raised a substantial doubt of the defendant's competency to be executed on the basis of:
>
> (1)   the motion, any attached documents, and any responsive pleadings; and
>
> (2)   if applicable, the presumption of competency under Subsection (e).
>
> * * *
>
> (f)   If the trial court determines that the defendant has made a substantial showing of incompetency, the court shall order at least two mental health experts to examine the defendant . . . to determine whether the defendant is incompetent to be executed.

TEX. CODE CRIM. PROC. art. 46.05.

On December 23, 2003, the trial court denied the motion, holding that: "the Defendant has

failed to set forth alleged facts in support of the assertion that the Defendant is presently incompetent

to be executed and has failed to make a substantial showing that the defendant is thus incompetent.

The court further finds that the Defendant has failed to raise raise a substantial doubt of the

-15-

defendant's competency to be executed on the basis of the said motion and attached documents, as required by Article 46.05(d), Tex. Code Crim. Proc." <u>See</u> Exhibit A.  The state court's decision is contrary to clearly established federal law for two reasons.  First, the state court applied a higher threshold burden than that permitted under <u>Ford v. Wainwright</u>, 477 U.S. 399 (1986).

In <u>Ford</u>, a majority of the Supreme Court held that states could require petitioners to meet a high threshold showing that competency is genuinely in issue before requiring a hearing.  Justice Marshall, writing for a plurality of the Court, stated "that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of nonmeritorious or repetitive claims of insanity."  477 U.S. at 416-17 (plurality opinion) (footnote omitted).  Similarly, Justice Powell noted that a presumption of sanity arises, not from an earlier determination that the prisoner is competent to be executed, but from the fact that the prisoner must have been found competent to stand trial before he could be convicted and sentenced.  <u>Id.</u> at 426 (Powell, J., concurring).  Therefore, Justice Powell concluded, the State "may properly presume that petitioner remains sane at the time sentence is to be carried out, and require a substantial threshold showing of insanity merely to trigger the hearing process."  <u>Id.</u>

The Court was clearly aware of the potential for abuse, while at the same time recognizing that execution competency is a moving target.  Justice O'Connor noted that:

> [T]he potential for false claims and deliberate delay in this context is obviously enormous. This potential is exacerbated by a unique feature of the prisoner's protected interest in suspending the execution of a death sentence during incompetency. By definition, this interest can *never* be conclusively and finally determined: Regardless of the number of prior adjudications of the issue, until the very moment of execution the prisoner can claim that he has become insane sometime after the previous determination to the contrary.

Id. at 429 (O'Connor, J., concurring in the result in part and dissenting in part) (emphasis in original).

Despite Justice O'Connor's concerns, a majority of the Justices found that a "substantial threshold showing" would effectively combat frivolous repetitious filings while still providing an acceptable standard for initial Ford claims as well.  As the Washington Supreme Court has recognized:

> The death row inmate has an obvious incentive to make a last-minute claim of insanity. Without a substantial threshold requirement, the eleventh hour petitions asserting insanity would be encouraged because the death row petitioner would know that the mere filing of a conclusory petition would result in a stay of execution.  Placing no initial burden on the petitioner is an invitation to specious insanity claims.

State v. Harris, 789 P.2d 60, 69 (Wash. 1990).

The Texas Legislature employed the same language that Justice Powell used in his concurring (and controlling) opinion in Ford to describe the petitioner's threshold burden on a competency-to-be-executed claim.  Cf. TEX. CODE CRIM. PROC. art. 46.05(f) ("substantial showing of incompetency" required to trigger appointment of "at least two mental health experts") with Ford, 477 U.S. at 426 (Powell, J., concurring in part and concurring in the judgment) (noting that State may require "a substantial threshold showing of insanity" to "trigger the hearing process").  The state court's adjudication of this claim by denying experts and a hearing "resulted in a decision that was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[3]  Accordingly, Mr. Panetti is entitled to de novo review of the merits of his Ford claim and an evidentiary hearing.

The gloss that Martinez-Villareal added to Ford now makes it crystal clear that no court should address the merits of a competency-to-be-executed claim until an execution warrant is issued

---

[3] "A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases."  (Terry) Williams v. Taylor, 120 S.Ct. 1495, 1519 (2000).

and the execution is imminent.  To make a reliable determination of Mr. Panetti's mental competence, therefore, this Court should examine all the evidence of his mental health history from 1981 to the present.

The issue of execution competency is not considered ripe until execution is imminent.  Justice O'Connor noted in Ford that, "until the very moment of execution" the issue of a prisoner's competency to be executed "can *never* be conclusively and finally determined."  477 U.S. at 429 (O'Connor, J., concurring in the result in part and dissenting in part) (emphasis in original).  In Martinez-Villareal, the Supreme Court held that a death-sentenced inmate's Ford claim was properly dismissed as premature, because the Arizona Supreme Court had not issued a warrant for his execution, "and therefore his competency to be executed could not be determined at that time."  523 U.S. at 643-45.  See Herrera v. Collins, 506 U.S. 390, 406 (noting that "the issue of sanity [for a Ford claim] is properly considered in proximity to the execution"); Martinez-Villareal v. Stewart, 118 F.3d 625, 627 (9th Cir. 1997) (holding that "the determination of whether an inmate is competent to be executed cannot be made before the execution is imminent, i.e., before the warrant of execution is issued by the state"), aff'd, Stewart v. Martinez-Villareal, 523 U.S. 637 (1998); Van Tran v. State, 6 S.W.3d 257, 267 (Tenn. 1999) (holding that execution is imminent "only when a prisoner sentenced to death has unsuccessfully pursued all state and federal remedies for testing the validity and correctness of the prisoner's conviction and sentence *and* this Court has set an execution date") (emphasis in original); Colbrunn v. State, 966 S.W.2d 511, 513 (Tex. Crim. App. 1998) (holding that the proper time to argue competency is "when execution is imminent").[4]

---

[4] "Imminent" is defined as "near at hand" and "on the point of happening." BLACK'S LAW DICTIONARY (5th ed. 1979) 676.

Taken together, Ford and Martinez-Villareal stand for the proposition that the relevant inquiry focuses on the petitioner's ***present*** competency.  The proper procedure for an unripe Ford claim requires that the court dismiss it without prejudice as premature and then revisit it once the execution becomes imminent.  Martinez-Villareal, 523 U.S. at 643-45; see Martinez-Villareal v. Stewart, 118 F.3d 628, 633-34 (9th Cir. 1997) (holding that "[j]ust as we must dismiss petitions containing unexhausted claims, we must dismiss a competency claim raised in a first petition because it will always be premature.  Just as we dismiss unexhausted claims to permit state courts to pass first judgment on those claims, we dismiss a competency claim so that the state court may have the first opportunity to consider that claim once a warrant of execution has issued.  And just as we permit an exhausted petition to be heard in federal court even after it had been dismissed previously as unexhausted, so too should we permit a ripe competency claim to be heard in federal court even after it had been dismissed previously as premature."), aff'd, Stewart v. Martinez-Villareal, 523 U.S. 637 (1998).

Neither the plurality opinion nor Justice Powell's concurring opinion in Ford defined the precise contours of the "high threshold showing" required before a competency hearing is necessary.  By examining cases from courts in various states, however, the parameters of that standard can be discerned.  For example, the Florida Supreme Court held that the petitioner met the threshold showing and was entitled to a competency hearing after presenting the reports of two psychologists and one psychiatrist who found the petitioner insane, even though the three psychiatrists appointed by the Governor to examine the petitioner had found him competent to be executed, relying in part on Medina's alleged statements that his lawyers told him to "act crazy."  Medina v. State, 690 So.2d 1241, 1245-46 (Fla. 1997).  As Justice Wells recognized:

In this case, the defendant presented extensive evidence of his long mental illness which included the detailed reports and affidavits of three professional mental health experts who had examined the defendant at length. These experts concluded that the defendant was incompetent to be executed insofar as his mental ability to comprehend what was happening to him. Clearly, under the caselaw set out above, and any objective evaluation of the evidence, there are reasonable grounds in this record to believe that Medina was incompetent to be executed. That doesn't mean that the State does not possess evidence to the contrary, and is entitled to present that evidence at a hearing. It simply means that the trial court must conduct a hearing and make a fair and just de novo determination of the issue of competency. A trial judge cannot just summarily accept the State's experts' opinions over those presented by the defendant. That is what judicial evidentiary hearings are for: to carefully and fairly assess and evaluate all of the evidence before rendering a fair and reasoned decision based on the evidence.

Id. at 1253-54 (Wells, J., concurring and dissenting) (footnote omitted). Medina stands for the

principle that a Ford petitioner can meet the "substantial threshold showing" even in the face of

conflicting evidence from the State's mental health professionals.[5]

Mata v. Johnson, 210 F.3d 324 (5th Cir. 2000), is also instructive. In Mata, the Fifth Circuit

fleshed out the scope of the threshold burden a petitioner must meet before a court is required to take

additional steps to determine whether a death-sentenced inmate is competent to abandon

postconviction review. The Fifth Circuit held that the evidence must raise "a bona fide issue of

petitioner's competency" before the court must order "a current examination by a qualified medical

---

[5] See Provenzano v. State, 751 So.2d 37 (Fla. 1999) (per curiam). In Provenzano, the Florida Supreme Court held that:

> [T]he evidence presented by Provenzano, which consisted of an expert report and other corroborating evidence of Provenzano's bizarre behavior, when taken alone, establishes reasonable grounds to believe that Provenzano is incompetent to be executed. The evidence presented by the State, which also included expert reports, created questions of fact on this issue. And these factual disputes should be examined and resolved in the crucible of an adversarial proceeding. Therefore, under the circumstances of this case, we remand for a hearing.

Id. at 40.

or mental health expert." Id. at 331. Counsel for Mata presented evidence of his lengthy history of mental health problems, shown in part by records from the Texas Department of Criminal Justice that documented the "numerous psychotherapeutic and antidepressant medications" doctors prescribed "to alleviate the symptoms of mental illness." Id. at 332. In addition, counsel for Mata provided two reports, from a mental health expert they had retained, which concluded that Mata was not competent to drop his appeals. Id. The Fifth Circuit found that this evidence raised "a bona fide question about Mata's competence." Id.

In Van Tran v. State, 6 S.W.3d 257 (Tenn. 1999), the Tennessee Supreme Court defined the contours of the "high threshold showing" permitted under Ford:

> This burden may be met by the submission of affidavits, depositions, medical reports, or other credible evidence sufficient to demonstrate that there exists a genuine question regarding petitioner's present competency. In most circumstances, the affidavits, depositions, or medical reports attached to the prisoner's petition should be from psychiatrists, psychologists, or other mental health professionals.

Id. at 269. The Tennessee Supreme Court added, "the unsupported conclusory assertions of a family member of the prisoner or an attorney representing the prisoner will ordinarily be insufficient to satisfy the required threshold showing. Id.; see Cox v. Norris, 167 F.3d 1211, 1213 (8th Cir. 1999) (finding that submission of statements from fellow death row inmates describing petitioner's "mostly idiosyncratic behavior" is insufficient to meet the "substantial threshold showing" permitted under Ford).

This is Mr. Panetti's *first* Ford claim; evidence of his mental status from 1981 to the present is relevant because it shows the consistency of his behavior and symptoms. Counsel presented evidence in the form of an affidavit from Dr. Arambula that meticulously document Mr. Panetti's

lengthy mental health history.  The records contain over a decade's worth of entries detailing Mr. Panetti's serious mentally illness.

The question at this preliminary stage is simply whether counsel has presented sufficient evidence raising a substantial question about Mr. Panetti's competency.  Counsel clearly has met this standard.  The state court should have held an evidentiary hearing to resolve the factual disputes on the ultimate Ford issues.  See id. at 1254; Provenzano, 751 So.2d at 40.

### Mr. Panetti is entitled to an evidentiary hearing on his Ford claim.

The Anti-terrorism and Effective Death Penalty Act (AEDPA) affects the grant of evidentiary hearings in federal court only if a habeas petitioner "failed to develop" the factual basis of a claim in state court.  See 28 U.S.C. § 2254(e)(2).  The Supreme Court held that Section 2254(e)(2) prohibits a federal evidentiary hearing only where there has been "[a] lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel" in failing to present the factual basis for the claim.  (Michael) Williams v. Taylor, 120 S.Ct. 1479, 1488 (2000).  "Diligence . . . depends upon whether the prisoner has made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful."  Id. at 1490.  The state court in Mr. Panetti's case applied an unconstitutional threshold burden in rejecting the Article 46.05 motion.  Accordingly, counsel for Mr. Panetti cannot be faulted for failing to fully develop the factual basis of his incompetency claim in light of the state court's denial of the appointment of mental health experts and a competency hearing. Moreover, counsel's allegations of Mr. Panetti's incompetency, if true, would entitle Mr. Panetti to relief.  Mr. Panetti is entitled to an evidentiary hearing in this Court on his Ford claim.

In <u>Mata v. Johnson</u>, 210 F.3d 324 (5th Cir. 2000), the Fifth Circuit announced the boundaries of a district court's discretion in fashioning procedures constitutionally adequate to determine a petitioner's competency to abandon collateral review.  The Fifth Circuit held that a district court must question the petitioner, on the record and in open court, concerning the knowing and voluntary nature of his decision to waive further proceedings.  <u>Id.</u> at 331.  The court explained:

> The opportunity for face-to-face dialogue between the court and the petitioner and the ability of the court to personally observe the petitioner is likewise important to the [competency] equation.  The Supreme Court held that Drope's absence from trial after the suicide attempt bore on its analysis, in that "the trial judge and defense counsel were no longer able to observe him in the context of the trial and to gauge from his demeanor whether he was able to cooperate with his attorney and to understand the nature and object of the proceedings against him."

<u>Id.</u> at 330 (quoting <u>Drope v. Missouri</u>, 420 U.S. 162, 181 (1975)).  By refusing to allow Mr. Panetti a hearing to testify and refusing to engage in any attempt to directly interview him, the state court violated the fundamentals of due process.  The state court compounded the violation by refusing to appoint counsel or mental health experts for Mr. Panetti.

## PRAYER FOR RELIEF

An erroneous determination of competence to be executed will impose grievous harm on Mr. Panetti, because execution is "the most irremediable and unfathomable of penalties."  <u>Ford</u>, 477 U.S. at 411.  The State has a substantial and legitimate interest in carrying out a valid death sentence.  However, "[b]y comparison to the defendant's interest, the injury to the State of the opposite error – a conclusion that the defendant is incompetent . . . – is modest."  <u>Cooper v. Oklahoma</u>, 517 U.S. 358, 365 (1996).  While a person who has previously been convicted and sentenced to death enjoys fewer legal protections than one who has not been convicted, a death-sentenced inmate who is incompetent is still entitled to his Eighth Amendment and Fourteenth Amendment rights not to be

executed. Ford, 477 US. at 410.  To impose on counsel for Mr. Panetti a standard more rigorous than that permitted by Ford – as the state courts have done in this case – is unjustified and risks grave and irreparable harm to Mr. Panetti.

ACCORDINGLY, counsel for Mr. Panetti ask this Court to:

1.    Stay Mr. Panetti's execution scheduled for February 5, 2003, until he becomes competent to be executed; or, in the alternative,

2.    Stay Mr. Panetti's execution to allow the parties a full and fair opportunity to develop and present reliable evidence about Mr. Panetti's current competency;

3.    Appoint and compensate undersigned counsel to represent Mr. Panetti in these competency proceedings;

4.    Authorize payment of funds for Mr. Panetti to retain mental health experts to evaluate him to determine whether he is malingering and whether he is competent to be executed;

5.    Grant undersigned counsel leave to conduct discovery, including the right to take depositions and to subpoena witnesses and documents necessary to the reliable resolution of his Ford claim;

6.    Hold an evidentiary hearing to resolve any disputed issues of fact about Mr. Panneti's present competency to be executed; and

7.    Grant such other relief as law and justice require.

Respectfully submitted,

Michael C. Gross
State Bar No. 08534480
106 South St. Mary's Street, Suite 260
San Antonio, Texas 78205
(210) 354-1919
(210) 354-1920 (Fax)

Counsel for the Petitioner,
SCOTT LOUIS PANETTI

## VERIFICATION

STATE OF TEXAS                          §
                                        §
COUNTY OF BEXAR                         §

Before me, the undersigned authority, appeared Michael C. Gross, Counsel for the Petitioner and on his behalf, on this the 23rd day of January 2004, and who being by me duly sworn did depose and say that each and every allegation of fact contained in the foregoing Petition For Writ Of Habeas Corpus is true and correct to the best of his knowledge.

Michael C. Gross

SWORN AND SUBSCRIBED to on this 23rd day of January 2004.



PRISCILLA YBARRA
MY COMMISSION EXPIRES
June 17, 2007

Notary Public In And For The State of Texas

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was mailed to Tina J. Dettmer, Assistant Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas 78711-2548, on this 23rd day of January 2004.

-25-

No. 3310

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | 216TH JUDICIAL DISTRICT |
| SCOTT LOUIS PANETTI | § | GILLESPIE COUNTY, TEXAS |

## ORDER DENYING APPLICANT'S MOTION TO DETERMINE COMPETENCY TO BE EXECUTED

On this date came on to be considered the Defendant's motion to determine competency to be executed in the above cause. The court having considered said motion, as well as all exhibits attached thereto, is of the opinion and finds that the Defendant has failed to set forth alleged facts in support of the assertion that the Defendant is presently incompetent to be executed and has failed to make a substantial showing that the defendant is thus incompetent. The court further finds that the Defendant has failed to raise a substantial doubt of the defendant's competency to be executed on the basis of the said motion and attached documents, as required by Article 46.05 (d), Tex. Code Crim. Proc.

It is therefore ORDERED that the Defendant's Motion to Determine Competency to be Executed is hereby DENIED.

SIGNED this __23__ day of December, 2003.

STEPHEN B. ABLES
Judge Presiding

Copies to:

✓ Counsel for the Applicant     12-24-03
✓ District Attorney

FILED

at 11:07 O'clock ___ AM

DEC 23 2003

DISTRICT CLERK
GILLESPIE COUNTY, TEXAS
By _____ Deputy
Chief Deputy

1

66