IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**FILED**

JUN 21 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

| | |
|---|---|
| **SCOTT LOUIS PANETTI,** | § |
| **Petitioner** | § |
| | § |
| **V.** | §      Case No. A-04-CA-042-SS |
| | § |
| **DOUG DRETKE, Director,** | § |
| **Texas Department of Criminal** | § |
| **Justice, Institutional Division,** | § |
| **Respondent.** | § |

## MOTION FOR DISCOVERY

Counsel for Petitioner Scott Louis Panetti asks this Court to order discovery essential to a mental health expert's conducting an assessment of competency that satisfies <u>Ford v. Wainwright</u>, 477 U.S. 399 (1986), and the Eighth and Fourteenth Amendments.

An objective and reliable assessment of competency that comports with professional standards of practice requires the collection of extensive social history records and documentation. <u>See</u> P.A. Zapf, et. al, <u>Assessment of Competency for Execution: Professional Guidelines and an Evaluation Checklist</u>, 21 BEHAV. SCI. LAW 103 (2003) (hereinafter "<u>Professional Guidelines</u>") (Exhibit 1); Bruce Ebert, Ph.D., J.D., ABPP, <u>Competency to Be Executed: A Proposed Instrument to Evaluate an Inmate's Level of Competency in Light of the Eighth Amendment Prohibition Against the Execution of the Presently Insane</u>, 25 LAW & PSYCHOLOGY REV. 29 (Spring 2001) (hereinafter "Ebert"). This compilation should include, but is not limited to, prison and jail medical and psychiatric records. <u>Id.</u> at 49-50. In addition, professional standards for conducting competency evaluations strongly recommend interviewing "collateral contacts"– "people such as prior health care providers and

1

psychiatrists/psychologists who have treated or evaluated the inmate, the inmate's family members, counsel for the inmate, the spouse or the offspring of the inmate, fellow inmates who have interacted with the inmate, correctional officers and religious personnel who have had contact with the inmate, friends who have visited the inmate over the past few years (to identify the period of incompetency) and any other individuals who have witnessed the inmate's behaviors." Id. at 50 n.156. Current medical records enable counsel to identify the names of psychiatrists, psychologists, and other mental health professionals who have most recently treated the petitioner and are familiar with his behavior and illness.

The records listed in the Schedule of Requested Discovery are relevant to an expert's ability to accurately assess Mr. Panetti's competency to be executed. They are needed to identify mental health professionals and correctional staff who have had contact with Mr. Panetti and are familiar with his prior and current condition and the severity of his mental illness. These records are in the exclusive possession of state agencies that will not turn over these records in the absence of a release from Mr. Panetti. Counsel is unable to obtain a knowing and voluntary records release from Mr. Panetti.

## SCHEDULE OF REQUESTED DISCOVERY

1.  Production, inspection, and copying of all records, documents, memoranda, and writings from September 25, 1995 (the date Scott Louis Panetti was received at TDCJ), to the present, including but not limited to the inmate file, in the possession, custody, or control of TDCJ, pertaining in any manner to Mr. Panetti. This request includes, but expressly is not limited to, medical, psychological, and psychiatric records.

2.  Production, inspection, and copying of all records, documents, memoranda, and writings in the possession, custody, or control of the Gillespie County Jail, the Kerr County Jail, and the Bell County Jail, pertaining in any manner to Scott Louis Panetti. This request includes, but expressly is not limited to, medical, psychological, and psychiatric records, disciplinary records, and records related to Mr. Panetti's classification and status in the Gillespie County Jail, the Kerr County Jail, and the Bell County Jail from the time of his arrest for the crime for which he is on Death Row, until the time he was transferred to TDCJ after his conviction and sentence.

A proposed order is attached.

Respectfully submitted,

Michael C. Gross
State Bar No. 08534480
106 South St. Mary's Street, Suite 260
San Antonio, Texas 78205
(210) 354-1919
(210) 354-1920 (Fax)

Attorney for the Petitioner,
SCOTT LOUIS PANETTI

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was mailed, via First Class U.S. Mail, to Tina J. Dettmer, Assistant Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas 78711-2548, on this ___ day of June 2004.

Behavioral Sciences and the Law
Behav. Sci. Law 21: 103–120 (2003)
Published online 2 July 2002 in Wiley InterScience (www.interscience.wiley.com). DOI: 10.1002/bsl.491

# Assessment of Competency for Execution: Professional Guidelines and an Evaluation Checklist

Patricia A. Zapf, Ph.D.*,
Marcus T. Boccaccini, M. A.[†],
and Stanley L. Brodsky, Ph.D.[‡]

The issue of whether mental health professionals should be involved in conducting evaluations of competency for execution is a topic that has elicited controversy and heated debate. This article picks up at a point beyond the controversy and addresses issues of professionalism and the objective assessment of competency for execution. Specifically, this article identifies professional standards for conducting competence for execution (CFE) evaluations, describes current practices in this area, and provides an interview checklist that can be used as an evaluation guide by involved professionals. Copyright © 2002 John Wiley & Sons, Ltd.

There has been much debate about whether mental health professionals should be involved in the assessment (and treatment) of competency for execution (CFE) (see Appelbaum, 1986; Bonnie, 1990; Brodsky, 1990 for early discussions of these issues; see Brodsky, Zapf, & Boccaccini, 2001 for an overview of the legal, ethical, and professional issues). Although some mental health practitioners refuse to participate in CFE cases, other mental health professionals choose to become involved. It is important, therefore, to look beyond the debate about whether mental health professionals should be involved in CFE cases and to develop professional guidelines for those who choose to become involved.

Brodsky (1990), in discussing ethical considerations in the evaluation of CFE, noted that 'the vaguer the goals and criteria are for any given task, the more likely the clinician is to utilize his or her own values: similarly, the more unstructured and vague the assessment methods are, the more likely it is that values will impose' (p. 92). An accepted protocol for performing CFE evaluations is needed to help prevent evaluators' personal values from having an undue influence on the results of their CFE assessments. As a first step toward meeting this need, we interviewed seven mental health experts who had conducted at least one CFE evaluation and

*Correspondence to: Patricia A. Zapf, Assistant Professor, Department of Psychology, The University of Alabama, Box 870348, Tuscaloosa, AL 35487-0348, U.S.A. E-mail: pzapf@bama.ua.edu
[†]Doctoral Candidate, Department of Psychology, The University of Alabama.
[‡]Professor, Department of Psychology, The University of Alabama.

Copyright © 2002 John Wiley & Sons, Ltd.

**EXHIBIT 1**

used their reports and opinions about conducting CFE assessments as a foundation for proposing a CFE evaluation checklist. This article outlines professional issues relevant to CFE evaluations, describes current practices in this area via a summary of our interviews, and provides a checklist of items that can be used by evaluators to guide their CFE assessments.

## DEFINITION AND CONCEPTUALIZATION OF COMPETENCY FOR EXECUTION

In *Ford v. Wainwright* (1986), the United States Supreme Court ruled that the Constitution's Eighth Amendment 'cruel and unusual punishment' clause prohibited the execution of an 'insane' person. Justice Marshall, delivering the opinion of the Court, concluded that the Eight Amendment 'prohibits the State from inflicting the death penalty upon a prisoner who is insane' (p. 419). The Court offered the following rationales for their decision: (i) execution of the insane would offend humanity, (ii) executing the insane would not set an example and would not reaffirm the deterrence value believed to exist with capital punishment, (iii) any individual who is believed to be insane is also believed unable to prepare 'spiritually' for death, (iv) madness itself is punishment and, therefore, negates the punishment value of execution, and (v) no retributive value is believed to be served by executing the mentally incompetent.

The Court in *Ford* did not specify a proper legal test of incompetence in the execution context. Melton, Petrila, Poythress, and Slobogin (1997) noted that the Supreme Court failed to provide a single legal standard and specific guidelines for evaluating this type of competency because the very issue was never raised. Only Justice Powell, in his concurring opinion, addressed the issue of the legal test for competency for execution. Justice Powell stated that the Eighth Amendment 'forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it' (*Ford v. Wainwright*, 1986, p. 2608). Further, he concluded that the proper test of competency should be whether the individual can comprehend the nature, pendency, and purpose of his or her execution. Justice Powell argued that only when defendants are aware of the connection between their crime and the punishment is the retributive goal of the criminal law satisfied, and that defendants can only prepare for death if they are aware that it is pending shortly. Justice Powell also asserted that the states were free to adopt 'a more expansive view of sanity' that included the 'requirement that the defendant be able to assist in his own defense' (*Ford v. Wainwright*, 1986, p. 2608). Subsequent federal decisions have kept the *Ford* criteria intact and have not expanded upon the definition or criteria to be used in considering competency for execution (Brodsky et al., 2001).

Every state prohibits the execution of 'insane' or 'incompetent' offenders since *Ford*. The definition of insanity or incompetence for execution, however, varies among jurisdictions. Acker and Lanier (1997) reviewed statutes and case law in every state that allows capital punishment and concluded that legal tests in all US jurisdictions incorporate the examination of two basic cognitive criteria (with the essential precursor of these cognitive criteria being that the individual being evaluated has a severe mental disease or defect): (i) the ability to understand the

nature of the punishment being imposed and (ii) the ability to understand the reasons why the punishment is being imposed (see also Harding, 1994). In addition, these authors noted that a third criterion is included in some jurisdictions, either as an alternative basis for a finding of incompetence or as an additional criterion to be satisfied. This third criterion takes into consideration the offender's capacity to comprehend the reasons that might make the capital sentence unjust and to communicate these reasons effectively.

It is important to note that some authors have commented on the relatively *low* standard of competence for execution as set out by the *Ford* decision and the necessity for evaluators to perform comprehensive assessments of all relevant aspects of competency—including those that go above and beyond the standard set out in *Ford* (see e.g., Zapf, 2002). The argument is that competence-related abilities such as rational understanding and appreciation (in addition to factual understanding) need to be addressed in the evaluation and discussed in the report to the court so as not to interpret the *Ford* criteria for the court, but rather to describe all relevant aspects of competency so the court can make an informed decision in each case.

## ASSESSMENT OF COMPETENCY FOR EXECUTION

Although almost every state has a legal test for competency for execution, it is not clear exactly how the *Ford* or other CFE criteria should be assessed. That is, because CFE evaluations are such a low base rate phenomenon, there has been little case law that elaborates on how the criteria are to be applied and assessed. In addition to the lack of legal guidelines and precedent, there are no assessment tools to aid evaluators called upon to perform this type of evaluation. Therefore, professionals who conduct these evaluations are left to their own devices in terms of how to perform the evaluation and how to interpret the legal criteria.

Brodsky, Zapf, and Boccaccini (1999) proposed a series of steps for the development of responsible, professional, and objective evaluations of CFE. These steps include (i) the development of minimum standards for adequate competence for execution evaluations, (ii) the collection of baseline data on current practices (e.g. interviewing a sample of psychologists and psychiatrists who conduct CFE assessments to identify the state of practice, problems, and concerns), (iii) the collection of data on issues that are of importance to other professionals involved in CFE cases (e.g. attorneys who represent death sentenced offenders and attorneys who represent the state in CFE hearings should be systematically sought out and interviewed), (iv) an analysis of how CFE assessments relate to the emerging psychometric understanding of competency assessments in general (e.g. areas of overlap and non-overlap of scholarly and professional frames of reference need to be studied and identified), and (v) the development of a checklist that can be used to standardize assessments and criteria.

This article seeks to address three of these steps. First, we have proposed a series of minimum standards for the adequate evaluation of competence for execution. Second, we have interviewed a number of mental health experts who have experience conducting competency for execution evaluations. The professionals surveyed were not randomly selected, but rather were a sample of professionals who

had agreed to be interviewed after being identified by the authors or others as having conducted an evaluation of this type. We believe the results of this survey can be used to help further develop standards and procedures for CFE evaluations. Finally, in the last section of this article, we propose a checklist of interview topic areas to be addressed by evaluators conducting assessments of competence for execution.

## MINIMUM STANDARDS FOR ADEQUATE COMPETENCY FOR EXECUTION EVALUATIONS

Minimum standards for CFE evaluations should parallel standards that apply to other types of forensic assessment. That is, standardized procedures that are used during the evaluation should be described to the subject of the evaluation as well as in the examiner's report, assessment measures should be specific to the referral issue(s), and the examiner should have a sound and sophisticated conceptualization of the criteria for being not competent for execution. In addition, the knowledge base of examiners should cover three domains: general legal competencies, forensic assessment methodologies, and execution-related substantive content. Finally, collateral information should be gathered. This might include (but would not be limited to) information regarding life history, psychological history and disorders, deterioration-related data, previous and current written reports, and interviews with persons who have had extensive opportunities to observe the subject.

Although *minimum* standards for competency for execution evaluations can be identified, these should not be equated with *professional* standards or guidelines for these evaluations. Professional standards or guidelines, as we see them, are more encompassing than minimum standards and form the basis for sound forensic practice. Whereas an evaluation that meets only the minimum standards might address the relevant issue in a perfunctory manner, an evaluation that also meets professional standards or guidelines would go above and beyond simply addressing the issue in an obligatory manner. An evaluation that meets minimum standards might be a brief, narrowly focused, concrete, and surface inquiry into the psycho-legal issue;[1] however, evaluations that meet professional standards should include informative and useful statements about the individual being evaluated and supply a detailed analysis of the issue to be addressed in the form of observations and statements that provide justification for the findings and opinions. An evaluation that meets professional standards should not only be useful to the court, it should ultimately be defensible in court. What follows is a discussion of assessment issues and professional guidelines for evaluations of competency to be executed.

## ASSESSMENT ISSUES RELATED TO COMPETENCY FOR EXECUTION

There has been a dearth of empirical research conducted on competency to be executed. Part of the explanation may be the fact that only a handful of individuals

---

[1]For instance, an examiner could conceivably conduct the interview portion of a CFE evaluation by asking only two questions: (i) Are you going to die? and (ii) Do you know why you are going to die?

have made successful claims of incompetency to be executed.[2] In addition, this particular type of competency tends to evoke strong emotion in individuals, which, in turn, may impact upon the motivation of involved professionals to conduct research in this area. The limited amount of research that has been conducted has been confined to surveys, usually of legal professionals (see e.g., Miller, 1988). No studies have examined CFE-related criteria in death row inmates or forensic patients.

There has been more commentary on the assessment of competency to be executed than there has been research. Heilbrun (1987) discussed the implications of the *Ford* decision for the assessment of competency to be executed and made five practical suggestions. First, with regard to the mental health professionals who are selected to evaluate an inmate's competency to be executed, Heilbrun argues that these evaluators need to have demonstrated skill in general clinical as well as clinical–legal areas. In addition, he makes the case that these professionals need to be chosen in a manner that eliminates the possibility of any systematic bias operating in the evaluation. For example, systematically eliminating (or including) only those evaluators that favor the death penalty from the potential pool of professionals who will conduct these evaluations may serve to introduce bias into the process that may not have otherwise existed. Second, Heilbrun contends that evaluators must (and, in fact, are ethically obliged to) inform any individual of the nature and purpose of a forensic evaluation before beginning. This is especially true in the case of competency to be executed. Evaluators should attempt to ensure that the inmate understands this notification of purpose (e.g. present the information using easily understood language; ask questions to attempt to determine the inmate's understanding of the information). Third, Heilbrun emphasizes the importance of a comprehensive evaluation, that is, including an assessment of intellectual functioning, personality characteristics, and motivation in addition to symptoms of psychopathology; having more than one contact with the inmate whose competence is being evaluated; an assessment of the possibility of malingering; and the use of collateral or third-party information. Fourth, the circumstances of the evaluation, which include the people who are present in the daily life of the inmate as well as the physical environment, need to be taken into consideration by the evaluator. Finally, Heilbrun underscores the importance of comprehensive documentation, usually in the form of a written report, to assist the decision maker and to allow others access to the procedures and reasoning processes used by the evaluator.

Heilbrun and McClaren (1988) discuss the assessment of competency for execution in terms of both preadjudication (before a formal legal judgment about an inmate's competency for execution has been made) as well as postadjudication (after an inmate has been legally deemed incompetent for execution). Given that only a handful of individuals have ever been found to be incompetent for execution (and would therefore require postadjudicative assessment of this type of competency), preadjudicative assessment of competency for execution is certainly the more prevalent type of assessment. Of course, the reader must keep in mind that assessments of competency for execution are much less common than assessments of almost any other type of competency.

With regard to the preadjudicative assessment of competency for execution, Heilbrun and McClaren (1988) outline a number of 'minimum requirements for

---

[2] At the time of writing, we have been able to find only six post-*Ford* cases of individuals found incompetent.

performing an excellent evaluation' and suggested that evaluators make their participation contingent upon having these minimum requirements met (p. 208). In addition, Heilbrun and McClaren argue strongly for the formal assessment of intellectual functioning, motivation, and psychopathology using well validated and standardized assessment instruments.

With respect to the legal criteria that need to be assessed, evaluators should be aware of the particular legal criteria that define the standard for competency within the relevant jurisdiction. If the criteria for competency for execution within a particular jurisdiction are not specified, Heilbrun and his colleagues (Heilbrun, 1987; Heilbrun & McClaren, 1988) advise that evaluators should consider the standard in its broadest form and then leave it up to the court to determine what is applicable and what is not. As previously mentioned, Zapf (2002) argues that, regardless of the specific criteria set out in a particular jurisdiction, a comprehensive evaluation of all relevant aspects of competency for execution be conducted and delineated in the report to court.

With regard to the postadjudicative assessment of competency to be executed, Heilbrun and MacClaren (1988) maintain that evaluators who are involved in the assessment of competency for execution at this stage should be independent of those who are responsible for treating the inmate for the purposes of restoring competence.

Mathias (1988) also observed the importance of taking the physical and social environment of the inmate into account when evaluating an individual's mental state on death row. He indicated that there are many variables that operate in the environment of death row that may affect an inmate's psychological functioning and presentation and may impact upon a mental health evaluation in a variety of different ways. The nature of a maximum-security setting can have a great impact upon an inmate's mental health and may affect competency status. Mathias argued that evaluators of an individual's competency need to consider these variables when conducting evaluations of competency to be executed.

Small and Otto (1991) explored the legal context and the clinical aspects of evaluations of competency to be executed. These authors encouraged the use of evaluation techniques that focus on the functional capacity of the inmate. Differing slightly from Heilbrun and his colleagues (Heilbrun, 1987; Heilbrun & McClaren, 1988) with respect to the use of traditional psychological testing, Small and Otto stated 'evaluations that emphasize traditional psychological testing and assessment are unlikely to assist the decision maker in assessing functional abilities' (p. 152; see also Melton et al., 1997). Consistent with this argument is the fact that the education level and/or mental state of many offenders on death row may render many traditional psychological tests invalid. Small and Otto do, however, concede that psychological testing may assist in identifying the core mental disorder, making treatment recommendations, or detecting malingering.

## PROFESSIONAL STANDARDS FOR COMPETENCY FOR EXECUTION EVALUATIONS

In the introduction of this article, we argued that the more unstructured and vague the criteria and goals are for any given task, the more likely it is that a clinician's own values and biases will impose on the task. We believe that the existence of accepted

professional standards for CFE evaluations will reduce the likelihood that clinicians' biases and values will undermine the integrity of their CFE evaluations. As we consider appropriate professional standards for the assessment of competence for execution (see also Brodsky et al., 2001; Heilbrun, 1987; Heilbrun & McClaren, 1988; Melton et al., 1997; Miller, 1988; Small & Otto, 1991) it is prudent to extrapolate from the work on the assessment of other types of competency (such as competence to stand trial and competence to consent to treatment) and to apply these professional principles to the assessment of competence to be executed. In this section, we propose professional guidelines for CFE evaluations.

## Knowledge Base

Before conducting a CFE evaluation, evaluators should be familiar with the relevant statutes, definitions, and criteria for competency for execution in their jurisdiction. In addition, CFE evaluators should be familiar with the procedural aspects of competence for execution cases within their jurisdiction (i.e. how, when, and by whom the issue of competence for execution may be raised; who determines that an evaluation is to occur; and what procedures are specific to the evaluation process). A competent evaluator should be knowledgeable about these legal requirements and procedures before beginning an evaluation of CFE. The evaluator should consult with whoever has ordered the evaluation to clarify the referral question and to ensure that all parties involved understand what is to be evaluated.

## General Evaluation Procedures and Considerations

We now discuss what it means to have a clear understanding of the referral question and how to decide when to consult with the individual requesting the evaluation. For example, an evaluator may be the only expert retained or may be one of several and assigned to evaluate one aspect of functioning (e.g. mental retardation). In this instance, it would be necessary for the evaluator to be clear about the boundaries of the specific case. CFE evaluations should be conducted in a place with adequate space and privacy that is free from distraction. In addition, CFE evaluators should seek to meet with the offender on more than one occasion as part of an assessment of consistency, deterioration, improvement, and other changes. Finally, CFE evaluations should include a clinical–forensic interview in which the offender's psychiatric history, symptom validity, and understanding of the relevant legal criteria for CFE in the particular jurisdiction are assessed. The relevant psycholegal criteria should be assessed in a structured and replicable manner. The information gained from the interview should be considered in light of collateral information that has been collected.

### Clinical–Forensic Interview

At the beginning of the forensic interview, CFE evaluators should inform the offender of the nature and purpose of the evaluation, the possible outcomes of the evaluation, for whom the evaluation is being performed, who will have access to

the results of the evaluation, and the consequences of not participating in the evaluation. Any indication of a lack of understanding on the part of the offender should be noted and appropriate measures taken to determine whether or not to continue with the evaluation. During the interview, evaluators should assess the offender's understanding of the relevant information in this the jurisdiction, the offender's appreciation of his or her situation, and his or her reasoning about these issues. In addition, the evaluator should inquire about the offender's previous and current psychological functioning and psychiatric history as well as any medication that the offender may be prescribed and its effect on the offender.

## Assessment Measures

CFE evaluators should be aware of the psycholegal abilities required of a competent offender. In the absence of a standardized assessment instrument specifically developed to assess the psycholegal criteria for a given jurisdiction, the evaluator should operationalize the applicable psycholegal criteria. Evaluators should focus on the functional abilities of the offender, in addition to the mental state of the offender and the appropriate diagnosis of a mental disorder, and should document how any functional deficits may be causally related to mental, emotional, or intellectual deficits. If it is a requirement of the jurisdiction that the offender be able to assist his or her attorney, then a true functional assessment would include observing the interaction of the offender with his or her attorney and attempting to determine whether or not the offender is able to assist the attorney (e.g. disclose relevant information to the attorney, understand what it is that the attorney is attempting to accomplish).

Finally, CFE evaluators should examine the possibility of response sets such as defensiveness, uncooperativeness, or malingering. Every effort should be made to use instruments that have established reliability and validity; after all, the motivation to malinger in this situation may be high. It may be necessary to use an instrument specifically designed to evaluate the potential for malingering or the authenticity of reported symptoms. The evaluator should use other psychological tests in the evaluation of CFE as indicated in a particular case (e.g. neuropsychological tests if there is some question of cognitive or neuropsychological impairment).

## Collateral Information

CFE evaluators should collect collateral information about the offender's previous and current functioning, as well as his or her functioning while on death row (including any specific behaviors that the offender has engaged in that might be relevant to psycholegal understanding[3]). Friends and family of the offender who can comment on previous and current functioning and characteristics should be interviewed. Correctional officers, prison physicians and psychologists, and other prisoners should be asked to comment on the behavior of the offender while in the

---

[3]These might include, but not be limited to, discussions of execution content with correctional personnel or chaplains, writing letters of goodbye or issue resolution, writing a will, giving away possessions, selecting witnesses, or making preferences for a last meal.

Copyright © 2002 John Wiley & Sons, Ltd.

institution. Medical records and psychiatric history both within and outside the correctional institution should be gathered and evaluated.

## Presentation of the Results of the Evaluation

CFE evaluators should carefully document the evaluation procedures as well as all other relevant information. Record keeping, note taking, and recording[4] the interview are important considerations and should be meticulous as these assessments are likely to undergo serious scrutiny. It is good practice for CFE evaluators to speak to the individual who retained their services before preparing a report. Although it remains arguable whether CFE evaluators should speak to the ultimate legal issue, they should certainly present the evidence before the triers of fact in a manner that will be of assistance in reaching a decision about whether the offender is capable of a specific psycholegal ability or required capacity (e.g. include a full history, observations, and testing including descriptions or observations of the offender and perhaps extensively quoting the offender's responses).

# CURRENT PRACTICES IN THE ASSESSMENT OF COMPETENCY FOR EXECUTION

To evaluate current practices in the evaluation of competency for execution and identify assessment issues that are considered to be important by professionals who conduct this type of evaluation, we interviewed seven mental health professionals who have been involved in evaluating competency to be executed. We asked these professionals about (i) their past experiences with specific cases in an attempt to determine how they conceptualize the nature of this type of competency and the pertinent issues in conducting this type of evaluation and (ii) specific checklist areas that may or may not be useful and/or necessary to include in an interview evaluation checklist for competency to be executed.

All seven of the mental health professionals that were interviewed held a Ph.D. degree; one also held a J.D. and one held an M.S.Ed. degree in addition to the Ph.D. Two individuals had conducted (or were presently involved in) competency for execution evaluations during the current year (in Arkansas and Tennessee), three others had conducted their last evaluation of this type in the 1990s (in Alabama, Missouri, and Texas), and two of the professionals last conducted a CFE evaluation in 1989 (in Utah and Arkansas).

When asked about current practices in the evaluation of competency for execution, the professionals identified a number of components that they believe make up the structure of a thorough CFE evaluation. Identified components included reviewing case materials, prison records, medical records, trial transcripts, and psychiatric records (including those during and prior to the offender's incarceration on death row); examining statutes or relevant court decisions to determine the

---

[4]Video or audio recording is useful in that the evaluator is able to review the evaluation as well as present the tape to complement his or her testimony; however, recording the evaluation is also subject to legal-strategic decisions by the attorney and, therefore, should be discussed with the retaining attorney beforehand.

Copyright © 2002 John Wiley & Sons, Ltd.

applicable criteria for a given jurisdiction; consulting with the retaining attorney; interviewing and conducting psychological or other relevant testing with the offender; interviewing family members of the offender, prison officials and correctional officers, and other offenders who have had contact with the offender; and observing the offender in his cell on death row.

The CFE evaluators reported using a number of different psychological tests during CFE evaluations including the MMPI (or MMPI-2), MCMI (or MCMI-II), PAI, SADS, or PSE to assess psychopathology and test-taking style; the SIRS, VIP, or Rey 15 to assess malingering (when indicated); the WAIS-R[5], Shipley, TONI, or KFAST to assess intellectual functioning or to diagnose mental retardation; the PPVT-R to assess language functioning; the BEERY or BNT to assess dementia; the PCL-R to assess psychopathy (when indicated); the IFI to assess reasoning ability; and the Halstead-Reitan to assess neuropsychological functioning (when indicated). There was some disagreement about whether or not to use projective techniques for this type of evaluation, with one professional indicating that he would use the Rorschach 'when indicated,' and another stating that he would 'never' use the Rorschach or any other projective technique for this type of evaluation. None of the other CFE evaluators mentioned projective techniques.

In response to inquiries about the assessment of the specific criteria for incompetency, all of the evaluators indicated that they asked the offenders specifically about each of the relevant criteria (for their respective jurisdictions). One evaluator indicated that he also used an unpublished checklist of items (Ackerson, unpublished doctoral dissertation) and another evaluator indicated that he used a forensic assessment instrument that was developed to assess an offender's reasoning abilities (the Interdisciplinary Fitness Interview). In addition, all of the evaluators reported that they focused specifically on the offender's understanding of death and the reasons for it. Three of the evaluators indicated that they made an attempt to assess the offenders' reasoning abilities, in addition to simple factual understanding, with respect to death.

When asked about the most challenging aspects of the evaluation of an offender's competency for execution, three global issues were identified: (i) the nature of the inquiry itself and the gravity of the consequences, (ii) the difficulty the evaluator may experience in trying to remain objective, and (iii) the evaluator's own personal difficulties with the death penalty.

With regard to the gravity issue, the CFE evaluators reported feeling that the magnitude and the immediacy of the consequences for the offender had an impact upon their evaluation in terms of the amount of time and energy they put into ensuring that they conducted a thorough and comprehensive evaluation. With regard to objectivity, one professional, speaking candidly, indicated that he found it difficult to maintain objectivity for three reasons: (i) you become sharply aware of your own personal beliefs about the death penalty, (ii) you get to know the offender and may not see anything to prevent the offender from being executed, and (iii) it is difficult to resist the pull to affiliate with the attorneys who retained you as the case is always presented to you from their point of view. Finally, with regard to the personal

---

[5]The reader is reminded that the majority of these evaluations were conducted a number of years ago and, therefore, some of the instruments reported, while perhaps out of date now, were not out of date at the time of the evaluation.

Copyright © 2002 John Wiley & Sons, Ltd.

difficulties, several CFE evaluators reported feeling that this type of evaluation can be emotionally difficult for the evaluator because the task forces the evaluator to deal with his or her own feelings and beliefs about capital punishment. When asked whether they would consider conducting another CFE evaluation in the future, six of the seven evaluators indicated that they would. Each of these evaluators felt that they were prepared to do these evaluations with what they perceived as the necessary amount of comprehensiveness and scrutiny. In addition, they felt that they would be leaving this task to someone who might not do as thorough a job if they declined. It appears that these evaluators were alluding to the distinction we made earlier in this paper. That is, that some evaluators might conduct evaluations that meet only the minimum standards rather than professional standards. The one evaluator who indicated that he would not conduct another CFE evaluation stated that he has had a change of heart with respect to capital punishment and no longer feels that the death penalty is an acceptable form of punishment. This evaluator felt that individuals who conduct this type of evaluation have to be in favor of the death penalty. We do not agree with this assertion but did not poll other evaluators about their opinions on this matter.

Specific problems that were encountered by these professionals in conducting CFE evaluations included difficulty in accessing medical records from other facilities, difficulty in finding a proper setting for this type of evaluation, difficulty in gaining access to the offender at times (e.g. being required to interview from behind glass at some facilities), difficulty in establishing or maintaining rapport with embittered offenders or those who refused to cooperate, and insufficient allocation of resources by the court (i.e. in terms of time required to obtain all the relevant records as well as compensation).

When asked to give their opinions about their respective jurisdiction's criteria for incompetency for execution, most of the evaluators indicated that they believed the criteria to be very minimal standards that were patterned after *Ford*, which has a very low threshold for competence. Several evaluators felt that the courts interpret the *Ford* criteria as *factual* understanding, whereas they believe that the courts should consider the higher standard of *rational* understanding when making CFE determinations. Similarly, when asked about the most difficult aspect of the CFE criteria to assess, a number of evaluators felt that it was difficult to distinguish between a factual and rational understanding of death. One evaluator indicated that this was especially so since there is no 'gold standard' for understanding death. When asked how they might change the CFE criteria if they could, a number of CFE evaluators stated that they would further define the required level of understanding.

In addition to questions about current practices in the evaluation of CFE, the CFE evaluators were also asked to give their opinions about items we had included in a preliminary version of our CFE interview checklist. We now turn to the subject of this last part of the inquiry: a checklist for CFE evaluations.

# CHECKLIST FOR EVALUATIONS OF COMPETENCY FOR EXECUTION

Prior to conducting the interviews with the CFE evaluators, we compiled a list of content areas that we felt were important or useful to include in a checklist for

evaluations of CFE. We then asked the CFE evaluators about the importance and utility of each of the checklist topics. Their responses were then used to revise and edit the checklist topic areas. The revised version of the checklist is presented in the Appendix.[6]

The checklist is divided into four sections: understanding the reasons for punishment, understanding the punishment, appreciation and reasoning (in addition to simple factual understanding), and ability to assist attorney. These four sections are representative of the legal criteria for CFE that have been set out by various states (see Acker & Lanier, 1997; Harding, 1994).

Most states model their statutes after the criteria set out in *Ford* and, therefore, consider only the prisoner's ability to understand the punishment that is being imposed and the reasons why it is being imposed. The first two sections of the checklist parallel these two *Ford* criteria. The first section targets the offender's understanding of the reasons for punishment: that is, his or her understanding of the crime and other conviction-related information. Specific topic areas include the offenders' understanding of the reasons why they are in prison; their place of residence within the prison; the crime for which they were convicted, including an explanation of the criminal act and victim identifying information; the perceived justice of the conviction; reasons why other people are punished for the same offense; and any self-identified, unique, understandings of the offense and trial that the offenders may have. These areas were identified as relevant content areas to determine the extent of the offender's factual understanding regarding punishment.

The second section targets the offender's understanding of the punishment: that is, that the punishment he or she is facing is death. Specific topic areas include the offender's understanding of the sentence; the meaning of a sentence of death; what it means for a person to be dead; specific understandings about death from execution; and the reasons for execution. The evaluators surveyed indicated that it was important to ask questions about death from a number of different angles (e.g. meaning of death, specific understandings about death from execution) so as to facilitate a thorough evaluation of any irrational beliefs or ideas the offender may hold regarding death.

The literature on other types of competence (e.g. competence to consent to treatment) documents that there is often a relationship between the severity of the consequences (to the individual being assessed) and the stringency of the standard used to evaluate competence (see, e.g., see Roth, Meisel, & Lidz, 1977). This, coupled with the gravity of the consequences in the particular instance of CFE, leads us to believe that it is important to assess the offender's appreciation and reasoning abilities (in addition to simple factual understanding). Therefore, the third section of the checklist lists topic areas specific to the assessment of an offender's appreciation and reasoning abilities with respect to death and execution. Specific content areas in this section include the offender's appreciation of the personal importance of the punishment and the personal meaning of death; the offender's rationality or reasoning about the physical, mental, and personal changes that occur during and after execution; beliefs regarding invulnerability; inappropriate affect; acceptance or eagerness for execution; and beliefs against execution. Although the *Ford* criteria are

---

[6]A user-friendly version of the checklist (i.e. with space for the offender's responses and the evaluator's comments) is available from the authors.

often interpreted as the offender's *factual* understanding, we believe that mental health professionals involved in CFE evaluations should also assess the offender's appreciation and reasoning and leave it to the court to determine how to interpret the *Ford* (or other relevant) criteria in each specific case.

Finally, the last section of the checklist identifies issues related to the offender's ability to assist his or her attorney. This section will be especially relevant in jurisdictions that rely upon criteria that are broader in nature than those outlined in *Ford*, such as the capacity to comprehend the reasons that might make the capital sentence unjust and to communicate these reasons effectively. Specific topic areas in this section include the identity of the offender's attorney and the amount of time that the attorney has been working for the offender; the offender's trust in the attorney; awareness of execution date; status of appeals; what the attorney is attempting to accomplish through the appeals; how the appeals will be processed and assessed; the actual substance of the appeals; important content that the offender may have withheld from the attorney; and any pathological reasons for not planning or discussing appeals.

## Using the Checklist

Several issues need to be emphasized regarding the use of this checklist. We have intended this checklist to serve as an *aide memoire* to assist professionals in conducting the interview portion of CFE evaluations.[7] While we have sought to be comprehensive, the evaluator needs to be mindful that important issues might arise in a particular case that have not been included in this checklist. Although the purpose of this checklist is to guide the evaluator through relevant issues pertaining to competence for execution, simply going through this checklist is not enough to assess every individual adequately with respect to competence for execution. We think of this checklist as an organizing structure to be used to guide the evaluator through relevant topic areas in the assessment of competency for execution.

Specific areas of inquiry follow each of the topics included on the checklist. Specific questions were deliberately not listed in order to encourage evaluators to develop their own style of questioning for each of the content areas. On a related note, it is important for evaluators to phrase questions in such a way so as not to lead the offender to exaggerated or malingered pathological responses. This precaution is, of course, part of all forensic interviewing in which evaluees may be motivated to exaggerate or present false impressions of psychopathological disorders.

The available research on death row offenders indicates that they are disproportionately intellectually limited and academically deficient (Cunningham & Vigen, 1999, manuscript under review). Therefore, it is important for evaluators to use language that is straightforward and understandable when evaluating a particular offender. If a particular offender holds a known delusional system, it would be important for an evaluator to assess this delusional system directly with respect to the execution process, the reasons why this individual is to be executed, and what it means to be executed, as well as the offender's beliefs about the perceived role that his or her attorney plays in this process.

---

[7] The evaluator is cautioned that the interview is only one component of a comprehensive competency for execution evaluation.

## CONCLUSION

In conclusion, we would like to make a few general points about the evaluation of competency for execution. First, we encourage professionals who perform CFE evaluations to think of them as being an area of specialization within their work. Although CFE evaluations would probably not be an *exclusive* area of practice for most practitioners (considering the low base rate of this type of evaluation), it is important to treat it as a specialization and to devote concentrated and attentive study, feedback, consultation, and continuing education to this task.

Second, we view CFE evaluations as an area of evolving practice. Although the *Ford* criteria, specifically, have evolved little, the consideration and understanding of what the *Ford* criteria mean to CFE evaluators appears to be evolving. In addition, the practice of psychological evaluations in this arena continues to develop. We view our work in this area as contributing to the dialogue and elaboration of issues that is designed to move this evolution along to the next stages. We encourage other professionals to do so as well in the interests of a fuller understanding of these important issues.

Finally, this checklist represents a first step that will need to go through a process that includes field-testing, standardization, and the development of norms. For this to happen it will be important to receive feedback from professionals who use this checklist in their practice.

## REFERENCES

Acker, J. R., & Lanier, C. S. (1997). Unfit to live, unfit to die: competency for execution under modern death penalty legislation. *Criminal Law Bulletin, 33*, 107–150.

Appelbaum, P. S. (1986). Competence to be executed: another conundrum for mental health professionals. *Hospital and Community Psychiatry, 37*, 682–684.

Bonnie, R. (1990). Dilemmas in administering the death penalty: conscientious abstention, professional ethics, and the needs of the legal system. *Law and Human Behavior, 14*, 67–90.

Brodsky, S. L. (1990). Professional ethics and professional morality in the assessment of competence for execution: a response to Bonnie. *Law and Human Behavior, 14*, 91–97.

Brodsky, S. L., Zapf, P. A., & Boccaccini, M. (1999). Post conviction relief: the assessment of competence for execution. *Proceedings of Psychological Expertise and Criminal Justice: An APA/ABA Conference for Psychologists and Lawyers* (Vol. 2, pp. 189–201). Washington, DC: American Psychological Association.

Brodsky, S. L., Zapf, P. A., & Boccaccini, M. (2001). The last competency: an examination of legal, ethical, and professional ambiguities regarding evaluations of competence for execution. *Journal of Forensic Psychology Practice, 1*, 1–25.

Cunningham, M. D., & Vigen, M. P. (1999). Without appointed counsel in capital postconviction proceedings: the self-representation competency of Mississippi death row offenders. *Criminal Justice and Behavior, 26*, 293–321.

Ford v. Wainwright, 477 U.S. 399 (1986).

Harding, R. M. (1994). 'Endgame': competency and the execution of condemned offenders—A proposal to satisfy the Eighth Amendment's prohibition against the infliction of cruel and unusual punishment. *St. Louis University Public Law Review, 14*, 105–151.

Heilbrun, K. S. (1987). The assessment of competency for execution: an overview. *Behavioral Sciences and the Law, 5*, 383–396.

Heilbrun, K. S., & McClaren, H. A. (1988). Assessment of competency for execution: a guide for mental health professionals. *Bulletin of the American Academy of Psychiatry and the Law, 16*, 205–216.

Mathias, R. E. (1988). Assessment of competency for execution: assessment and dissonance on death row—the dilemma of consultation. *Forensic Reports, 1*, 125–132.

Melton, G. B., Petrila, J., Poythress, N. G., & Slobogin, C. (1997). *Competency to stand trial, psychological evaluations for the courts: A handbook for mental health professional and lawyers* (2nd ed ). New York: Guilford.

Copyright © 2002 John Wiley & Sons, Ltd.

Miller, R. D. (1988). Evaluation of and treatment to competency to be executed: a national survey and analysis. *The Journal of Psychiatry and the Law, 16,* 67–90.

Small, M. A., & Otto, R. K. (1991). Evaluations of competency to be executed: legal contours and implications for assessment. *Criminal Justice and Behavior, 18,* 146–158.

Roth, L. H., Meisel, A., & Lidz, C. W. (1977). Tests of competency to consent to treatment. *American Journal of Psychiatry, 134,* 279–284.

Zapf, P. A. (2002, March). *The assessment of competency for execution: Going above and beyond the Ford criteria.* Invited participant, Mini Conference on Capital Case Litigation, Biennial meeting of the American Psychology–Law Society: Austin, TX.

# APPENDIX: INTERVIEW CHECKLIST FOR EVALUATIONS OF COMPETENCY FOR EXECUTION

This checklist was developed for use in evaluations of competency for execution. The evaluator is encouraged to ask additional and follow-up questions to ensure a thorough understanding of the offender's abilities in each area. Specific areas of inquiry are included for each topic in the checklist.

*I. Understanding of the reasons for punishment*
  i. Reason why in prison
    a. How offender came to be in prison
    b. What offender did to get there
    c. Initial charges and how they led to actual conviction
    d. Sequence of events from offense to arrest, trial, sentence, and then to imprisonment
  ii. Place of residence within the prison
    a. Where offender currently resides within the prison, including number of cell or dorm, name of cell block, and the area of the prison (e.g. protective custody, segregation, death row, general population)
    b. Prior places of residence within the prison, including hospital, segregation, holding cells, or other units
  iii. Conviction information
    a. Crime for which offender was convicted
    b. When offender was convicted
    c. In what city or county, state, and court the trial was held
    d. How long offender has been in prison
  iv. Explanation of criminal act
    a. Name of the criminal act offender committed
    b. Similarities and differences between this and the actual behaviors involved in the offense
    c. What (insert charge for which offender was convicted) involves/entails
  v. Victim identifying information
    a. Name of the victim
    b. Age of the victim
    c. Whether the victim was a male or female
    d. Ways in which the victim is described and understood by offender
  vi. Perceived justice of conviction
    a. What offender believes was just about his/her conviction

    b. What offender believes was unjust about his/her conviction
    c. Fairness, accuracy, and what was and would be right are explored

  vii. Reasons other people are punished for same offense
    a. What offender believes about *why* other people convicted of (same offense) are punished
    b. What offender believes about the type of punishment that *anyone* convicted of (same offense) receives
    c. Reasons for different degrees of punishment

  viii. Self-identified unique understandings of offense and trial
    a. Any special understandings of his/her *offense* that makes sense only to the offender
    b. Special understandings of his/her *trial* that makes sense only to the offender
    c. Aspects of this charge or crime that most people would not understand unless the offender told them

II. *Understanding of the punishment*
  i. Sentence for the crime—specifically
    a. Sentence that offender received for his/her conviction
  ii. Meaning of a sentence of death
    a. Beliefs about what it actually means to receive a sentence of death
  iii. Meaning when a person is dead
    a. Beliefs about what it means for any person to be dead
    b. Beliefs about what it would mean for him/her to be dead
    c. How he/she would know that someone was dead
  iv. Specific understanding about death from execution
    a. Explanation of the procedures for execution that he/she will undergo: what happens, how it works
    b. Explanation of what will be done with his/her property after execution
    c. Explanation of what will be done with his/her remains after execution
  v. Reasons for execution
    a. Reasons and beliefs about why s/he *should* be executed
    b. Reasons and beliefs about why s/he *should not* be executed
    c. Societal reasons, religious ideas, legal issues, involvement of other persons, personalized reasons

III. *Ability to appreciate and reason in addition to simple factual understanding*
The following items address the issues of appreciation and reasoning. Although the criteria for competency to be executed from *Ford v. Wainwright* do not specifically use the terms appreciation or reasoning, it may be important to establish the offender's appreciation of the personal importance of these proceedings and reasoning or ability to rationally manipulate information regarding the proceedings.[8]

---

[8]With respect to the criteria for competence to stand trial, many jurisdictions require the defendant to have the ability to appreciate and reason in addition to simple understanding. In addition, the literature in the area of competence to consent to treatment indicates that there is often a relationship between the severity of the consequences and the stringency of the standard used to evaluate competence. Given the serious nature of the consequences in the case of competence for execution and the fact that more than the simple ability to factually understand is usually required for competence to stand trial, it would therefore, make sense for a stricter standard than simply the ability to factually understand be used for competence for execution. This standard could include understanding as well as appreciation, and rationality or reasoning.

Copyright © 2002 John Wiley & Sons, Ltd.    

   i. Appreciation of the personal importance of this punishment
     a. What it would mean to be executed
     b. Issues of triviality, irrelevance, involvement, salience
  ii. Appreciation of the personal meaning of death
     a. What it will mean personally to be dead: events, activity, consequences, changes
     b. Ways in which the offender will be otherwise affected
     c. Ways in which others (important to the offender) will be affected
 iii. Rationality/reasoning regarding the physical changes during and after execution
     a. Explanation about whether s/he will be physically different after s/he is executed (than s/he is now)
     b. Explanation about exactly what happens physically when *anyone* is executed (and when the offender him or herself is executed)
 iv. Rationality/reasoning regarding the mental changes during and after execution
     a. Explanation about what will happen mentally when s/he is executed
     b. Beliefs about whether and how s/he will be any different mentally after execution than s/he is right now
  v. Rationality/reasoning regarding other personal changes during and after execution
     a. Beliefs about transformations or changes that will happen to him/her after execution
 vi. Rationality/reasoning regarding beliefs in invulnerability
     a. Reasons or beliefs why s/he will not or may not die when executed
     b. Whether anything different would happen personally upon execution than to anyone else who is executed
 vii. Inappropriate affect about execution with associated rationality/reasoning
     a. Current feelings when s/he thinks about being executed
     b. How the offender imagines s/he will feel just prior to being executed
     c. Unexpected or peculiar affect
viii. Rationality/reasoning regarding acceptance or eagerness for execution
     a. Reasons why the offender might be looking forward to being executed
     b. Reasons why the offender may have accepted his/her execution

 ix. Rationality/reasoning regarding factors associated with beliefs that person should not be executed
     a. Reasons why s/he *should* not be executed
     b. Reasons why s/he *might* not be executed
*IV. Ability to Assist Attorney*
   i. Identity of attorney
     a. Name of the offender's attorney
     b. Where located
     c. Address or phone number
     d. What attorney looks like
  ii. Time with current attorney
     a. How long since this attorney has been retained by the offender
     b. Last time that the offender saw or spoke to attorney
     c. Frequency of correspondence with attorney

      d. Frequency with which the offender has seen attorney (over some length of time)

iii. Trust of attorney
      a. Trust in attorney's skills and competence
      b. Trust in attorney's caring and investment in case
      c. What the attorney has specifically done to show that he or she is trustworthy
      d. Indications that attorney can or cannot be trusted
      e. Beliefs regarding for whom attorney works

iv. Awareness of execution date (if any) or likely date
      a. Knows if execution date has been set
      b. If a date has been set, what that date is
      c. If a date has or has not been set, ideas about when he/she might be executed

v. Status of appeals
      a. Knowledge if whether attorney is currently working on an appeal, and, if so, what it is
      b. Knowledge of filings of any previous appeals on his/her behalf
      c. What (if any) appeals are still available

vi. What attorney seeks to accomplish through appeals
      a. Understanding of issues and goals in appeals
      b. What could happen as a result of the appeals

vii. How appeals will be processed and assessed
      a. Understanding of what happens as appeals are processed and assessed
      b. Knowledge of who is responsible for hearing and making a decision about appeals

viii. Actual substance of appeals
      a. Whether the offender has read any of the information prepared for the appeals
      b. Offender's understanding about what issues the appeals are based on

ix. Important content withheld from attorney
      a. Whether attorney has been told everything needed in order to file appeals on the offender's behalf
      b. Anything that the offender has deliberately withheld from his/her lawyer
      c. Any information that the offender would never tell his/her lawyer

x. Pathological reasons for not planning or discussing appeals
      a. Any personal reasons that other people might not understand for why offender might not plan an appeal
      b. Any special reasons why the offender might not discuss an appeal
      c. Anything happening that keeps the offender from believing attorney or speaking freely with attorney

Copyright © 2002 John Wiley & Sons, Ltd.        

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **SCOTT LOUIS PANETTI,**<br>**Petitioner** | § | |
| | § | |
| **V.** | § | **Case No. A-04-CA-042-SS** |
| | § | |
| **DOUG DRETKE, Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Institutional Division,** | § | |
| **Respondent.** | § | |

## ORDER

Petitioner Scott Louis Panetti's Motion for Discovery is GRANTED. The State shall provide

to the Petitioner the documents listed in the Schedule of Requested Discovery.


SIGNED on this _____ day of _____ 2004.


_____
UNITED STATES DISTRICT JUDGE