IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2014 NOV 26 PM 2:04
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____KKC_____
DEPUTY

SCOTT PANETTI,
      Petitioner,

-vs-                                                                                                       Case No. A-04-CA-42-SS

WILLIAM STEPHENS, Director, Texas
Department of Criminal Justice, Correctional
Institutions Division,
      Respondent.

## ORDER

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and particularly Petitioner's Motion for Stay of Execution [#176], Petitioner's Motion for Appointment of Counsel [#177], Petitioner's Corrected Motion for Authorization of Funds Under 18 U.S.C. § 3599 to Hire Mental Health Expert and Investigator [#180], and Respondent's Response in Opposition [#181] thereto.[1] Having reviewed the documents, the governing law, and the file as a whole, the Court enters the following opinion and orders DENYING the motions.

### Background

In 1992, Petitioner Scott Panetti shot and killed his wife's parents in front of his wife and their three-year-old daughter. Prior to trial, the state court held two hearings on the question of Panetti's competency; following the second, a jury found Panetti competent to stand trial. Mar. 8, 2011 Order [#31] at 2, *Panetti v. Johnson*, No. A-99-CA-260-SS (W.D. Tex. 2009). At trial, Panetti

---

[1] Panetti's original Motion for Authorization [#178] is DENIED as MOOT, given his filing of the superceding corrected motion.

demanded to represent himself, despite his history of schizophrenia and institutionalization; the state court nevertheless appointed him standby counsel. *See id.* at 2–3. Insanity was his only defense. The jury convicted Panetti of capital murder and sentenced him to death, and the Texas Court of Criminal Appeals (TCCA) upheld the conviction and sentence on direct and collateral review. *See Panetti v. State*, No. 72,230 (Tex. Crim. App., Dec. 3, 1997); *Ex parte Panetti*, No. 37,145-01 (Tex. Crim. App., May 20, 1998).

Panetti filed his first federal habeas petition in 1999, claiming, among other things, he was incompetent both to waive counsel and to stand trial. Panetti did not then argue he was incompetent to be executed. This Court rejected his incompetency claims,[2] *see* Mar. 8, 2011 Order [#31], *Johnson*, No. A:99-CA-260-SS, and the Fifth Circuit affirmed, *see Panetti v. Cockrell*, No. 01-50347 (5th Cir. June 19, 2003).

In late 2003, the state trial court set Panetti's execution date for February 5, 2004. *Panetti v. Quarterman*, 551 U.S. 930, 937 (2007). In December 2003, Panetti filed a motion under Article 46.05 of the Texas Code of Criminal Procedure, claiming for the first time he was incompetent to be executed. *Id.* at 938. The state court found Panetti failed to show incompetence, and the TCCA dismissed his appeal for lack of jurisdiction. *See Ex parte Panetti*, No. 74, 868 (Tex. Crim. App. Jan. 28, 2004).

On January 26, 2004, Panetti filed his second federal habeas petition in this Court, accompanied by a motion to stay his execution. *See* Pet. Writ Habeas Corpus [#1]; Jan. 2004 Mot. Stay Execution [#2]. His petition claimed the state trial court's ruling on his competency violated

---

[2] Panetti's additional claims were ultimately rejected by the Fifth Circuit on procedural grounds. *See Panetti v. Cockrell*, No. 01-50347 (5th Cir. June 19, 2003).

clearly established Supreme Court precedent—specifically, the Supreme Court's decision in *Ford v. Wainwright*, 477 U.S. 399 (1986). *See* Sept. 29, 2004 Order [#42] at 2. Panetti appended supplemental evidence of his mental condition to the petition. *Id.* Rather than ruling on the merits, this Court stayed Panetti's execution for 60 days to allow the state court to consider the supplemental evidence. *See id.* at 3.

The state court thereafter appointed two experts to evaluate Panetti. The experts concluded Panetti "knows that he is to be executed, and that his execution will result in his death, and . . . that he has the ability to understand the reason he is to be executed[.]" *Quarterman*, 551 U.S. at 940 (internal quotations omitted). Further, the experts "alleged that [Panetti's] uncooperative and bizarre behavior was due to calculated design[.]" *Id.* Panetti filed objections to the experts' conclusions and asked the state court to hold an evidentiary hearing. Sept. 29, 2004 Order [#42] at 4. The state court, however, failed to do so, and closed the case.

Panetti then returned to this Court. On July 20, 2004, this Court held that because the state court's appointment of experts to evaluate Panetti was an implicit finding Panetti had made "a substantial showing of incompetency," the state court's failure to hold an evidentiary hearing violated Panetti's due process rights under *Ford*. *Id.* at 4–5. Consequently, this Court set an evidentiary hearing to determine Panetti's competency to be executed, appointed counsel, and authorized funds so Panetti could obtain investigative and expert assistance. *Id.* at 5. At hearing, Panetti presented the testimony of four medical experts; the State presented the testimony of two medical experts and three lay fact witnesses. *Id.* at 8.

Following the hearing, and reasoning from the premise "the Fifth Circuit test for competency to be executed required the petitioner know no more than the fact of his impending execution and

the factual predicate for the execution[,]" this Court held "[b]ecause . . . Panetti knows he committed two murders, . . . knows he is to be executed, and . . . knows the reason the State has given for his execution is his commission of those murders, he is competent to be executed." *Id.* at 16, 18. This Court further noted "Petitioner's delusional beliefs—even those which may result in a fundamental failure to appreciate the connection between Petitioner's crimes and his execution—do not bear on the question of whether petitioner 'knows the reason for his execution' . . . , because Fifth Circuit case law" required only satisfaction of the test articulated above. *Id.* at 17. The Fifth Circuit affirmed. *See Panetti v. Dretke*, 448 F.3d 815 (5th Cir. 2006).

The Supreme Court granted certiorari and reversed. *See Quarterman*, 551 U.S. at 960. The Court reasoned "a prisoner's recognition of the severity of the offense and the objective of community vindication are called into question . . . if the prisoner's mental state is so distorted by a mental illness that his awareness of the crime and punishment has little or no relation to the understanding of those concepts shared by the community as a whole." *Id.* at 958–59. Consequently, the Court held the Fifth Circuit's test, which merely established a prisoner's factual awareness of his impending execution and the state's articulated premises for executing him, offended *Ford*; to stand competent for execution, a prisoner must also have a "rational understanding" of the State's rationale. *Id.* at 960. The Supreme Court remanded the case for further development of the record on the issue of whether and to what extent Panetti's delusions rendered him incapable of understanding the reason for his punishment and consideration of the issue in light of *Roper v. Simmons*, 543 U.S. 551, 560–64 (2005); *Atkins v. Virginia*, 536 U.S. 304, 311–14 (2002); and *Ford*, 477 U.S. at 406–10.

Accordingly, on February 6, 2008, this Court held a second evidentiary hearing on the issue

of Panetti's competency to be executed. As the undersigned recounted:

> The evidence presented . . . was exhaustive. The Court heard expert opinions from psychiatrists, psychologists, and neuropsychologists for both Panetti and the State. Additionally, the Court heard testimony from fellow inmates and the guards and chaplain who have had contact with Panetti on Death Row. The Court reviewed volumes of medical, social security, and prison records regarding Scott Panetti's longstanding mental illness and delusions. Finally, the Court heard some eleven hours of conversations between Panetti himself and his parents and other visitors, recorded by the State during his visitation hours in December of 2007 and January of 2008.

Mar. 26, 2008 Order [#145] at 4.

This Court spent nearly twenty pages recounting the substance of the evidence presented at hearing in its March 26, 2008 Order. *See id.* at 29–48. Following its account, this Court considered the question of Panetti's competence at length in light of the Supreme Court's remand opinion and as applied to the evidence presented, and ultimately denied Panetti's habeas petition, finding Panetti had "both a factual and rational understanding of his crime, his impending death, and the causal retributive connection between the two" and was therefore competent to be executed. *Id.* at 62.

Panetti appealed, but before the Fifth Circuit could address his competency claims, he filed a motion to stay and abate the proceedings so he could return to Texas state court to raise a claim under *Indiana v. Edwards*, 554 U.S. 164 (2008). As was relevant to Panetti given his self-representation at trial, the *Edwards* court held "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Edwards*, 554 U.S. at 178. On December 17, 2008, the Fifth Circuit granted Panetti's motion. Panetti subsequently filed another state habeas petition, which was dismissed by the TCCA
-5-

on October 21, 2009. *See Ex parte Panetti*, No. WR-37,145-02, 2009 WL 3368707 at *1 (Tex. Crim. App. Oct. 21, 2009).

The next day, Panetti filed his third federal habeas petition in this Court, having sought and received permission from the Fifth Circuit to do so. Jan. 31, 2012 Order [#45], *Panetti v. Thaler*, No. A-09-CA-774-SS (W.D. Tex. 2009). While that petition was pending, the TCCA decided *Chadwick v. State*, 309 S.W.3d 558 (Tex. Crim. App. 2010), which addressed the meaning of *Edwards*; in light of that decision, this Court granted Panetti leave to file a second successive state habeas petition. The TCCA once again dismissed the petition, and the Supreme Court denied certiorari. *See Panetti v. Texas*, 131 S. Ct. 3027 (2011). Panetti then returned to this Court to litigate his *Edwards* claim, and in a lengthy opinion, this Court held not only was Panetti's *Edwards* claim barred by *Teague v. Lane*, it also failed on the merits. *See* Jan 31, 2012 Order [#45], *Thaler*, No. A-09-CA-774-SS.

On August 21, 2013, the Fifth Circuit issued an opinion affirming both this Court's 2008 rejection of Panetti's competency-to-be-executed claim and this Court's 2012 rejection of Panetti's *Edwards* claim. *See Panetti v. Stephens*, 727 F.3d 398 (2013). The Supreme Court denied Panetti's subsequent petition for writ of certiorari. *See Panetti v. Stephens*, 135 S. Ct. 47 (Oct. 6, 2014) (mem. op.).

We arrive at the present. On October 16, 2014, the state court again set an execution date for Panetti: December 3, 2014. Panetti subsequently filed in the state court his "Motion for Emergency Hearing," in which he argued the execution date should be withdrawn or modified so he could further litigate the issue of his competency to be executed under Article 46.05 of the Texas Rules of Criminal Procedure. *See* Mot. Stay Execution [#176-1], Ex. B (TCCA Opinion) at 2. The

court denied his motion. Panetti then filed a "Renewed Motion to Stay or Modify Execution Date, Appoint Counsel, and Authorize Funds for Investigative and Expert Assistance to Provide Meaningful Opportunity to Prepare Article 46.05 Motion," in which he argued although he could make a "colorable" showing of incompetency, he could not meet the threshold requirement of Article 46.05 without a stay, appointment of counsel, and funding for a new set of experts. *Id.* at 2–3. The state court denied his motion, and the TCCA affirmed the denial on grounds it lacked jurisdiction. *Id.* at 3.

Panetti has now returned to this Court seeking the relief the state courts declined to provide. He argues "because he can make a threshold preliminary showing of incompetency that dispels any doubt that the claim is frivolous," this Court should once again stay the execution, appoint attorneys for Panetti, and authorize funds for an investigation into Panetti's mental state. The Court declines to do so.

## Analysis

### I. Jurisdiction

The Court first notes the posture in which Panetti's motions come before the Court. He has neither filed a habeas petition nor, as the TCCA concluded, an Article 46.05 petition. *See* TCCA Opinion at 3. Rather, Panetti "seeks to investigate the grounds for a *Ford* claim and prepare a habeas petition raising one." Mot. Appointment Counsel [#177] at 2. Panetti points out although he has not yet filed a habeas motion, the Fifth Circuit has held a motion to appoint counsel qualifies as a "post conviction proceeding under [28 U.S.C. § 2254], seeking to vacate or set aside a death sentence" such that this Court may assume jurisdiction over his motion to stay execution. 18 U.S.C. § 3599(a)(2); *In re Hearn*, 376 F.3d 447, 451 (5th Cir. 2004) (citing *McFarland v. Scott*, 512 U.S.

849 (1994)) (construing 21 U.S.C. § 848(q)(8), the predecessor to § 3599(a)(2)). In his Response, Respondent points out the Fifth Circuit later limited *Hearn* to only those prisoners who presently lack counsel, whose claims are based on previously unavailable Supreme Court authority, and to whom *Atkins v. Virginia*, 536 U.S. 304 (2002) applies, and contends Panetti satisfies none of those criteria. Resp't's Resp. [#181] at 16.

Respondent may be correct that *Hearn* does not apply to Panetti's case. It is not clear from either party's briefing how that possibility would affect this Court's jurisdiction to entertain Panetti's motion. Given the extremely tight timeline between today's date and the date Panetti is set to be executed—December 3, 2014, one week from today—the Court believes the best course of action is to assume, without definitively deciding, jurisdiction, and proceed to the merits of Panetti's *Ford* claim.

## II. Merits

Panetti argues the state court's refusal to stay his execution, appoint him counsel, and provide him with funding violated his due process rights under *Ford* and *Quarterman*. The Court disagrees. The procedural rights described in *Ford* are triggered upon "a substantial threshold showing of insanity[,]" *Ford*, 477 U.S. at 426 (Powell, J., concurring in part and concurring in judgment), and the undersigned finds Panetti has failed to make the "threshold showing" which would trigger his entitlement to the relief he seeks.

Attempting to make that showing, Panetti argues in his motion to stay that the mental health professionals and correctional officers in contact with Panetti "have noted alarming and aberrational changes" in his behavior over the last two years. Panetti appends a number of Texas Department of Criminal Justice (TDCJ) records from his incarceration to his motion, which indicate, for example,

Panetti requested an appointment with a clinician to discuss the possibility of going back on antipsychotic medication; told an officer "you're crooked and I'm going to smite you for your wickedness"; complained "the food on my special diet trays has been consistently bad" because items were often "rotten" or "stolen"; complained about the quality of his diet in general; requested a visit with a psychiatrist; made unfounded grievances against correctional officers and other inmates; threw urine out of his cell; and, in one episode, "beat on his door and yell[ed] repeatedly." *See* Mot. Stay Execution [#176-1], Ex. C (TDCJ Records) at 4, 7, 9, 11–14, 19, 28. Other than the TDCJ records, Panetti offers (1) the "observations" of his own counsel, who "visitied Mr. Panetti for two hours on death row" and concluded he was "exhibiting flight of ideas and looseness of associations," as he at times bounced from strange topic to strange topic during their conversation and told counsel he was hearing voices, *see id.* [#176] at 24, and (2) the hearsay statements of Diane Mosnik, Ph.D, a neuropsychologist who has had no contact with Panetti, but reviewed the 2007 experts' reports on Panetti and portions of Panetti's TDCJ records. *See id.* at 29–32. Based on this evidence, Panetti argued before the state courts that "although he has made a colorable showing of incompetence, without necessary funding to obtain the assistance of mental-health experts, he c[an]not show his incompetence under the standard set forth in Article 46.05(e)." TCCA Opinion at 3.

The Court finds, considering the question in light of the wealth of evidence on the issue of Panetti's competency previously amassed in this case, Panetti's evidence of incompetence is insufficient to make the threshold showing necessary to trigger *Ford*. The Court has twice appointed counsel for Panetti, twice funded expert investigations of his mental condition, and twice held extensive evidentiary hearings on his competency. While much of the behavior recounted in the new

TDCJ records provided by Panetti is certainly strange, it is not measurably different from the behavior documented in the records scrupulously examined by this Court in its March 26, 2008 Order. For example, as explained in the Order, Dr. Mary Alice Conroy testified during this Court's 2004 evidentiary hearing that Panetti "believed he has been under attack by 'supernatural demonic anti-forces' since the mid-1980s, when demons were possessing his house and personal belongings." Mar. 26, 2008 Order [#145] at 26. Panetti told Conroy he believed the State "want[ed] to execute him to stop him from preaching[.]" *Id.* Panetti discussed the alleged influence of his alternate personality, "Sarge," over him when he committed the 1992 murders with at least two of the 2004 experts. *Id.* During the 2008 evidentiary hearing, Panetti told Dr. David Self he was on Death Row "[t]o preach the Gospel of Jesus Christ" and he was sentenced to die because people "have strong delusions." *Id.* at 32–33. Panetti discussed his purported multiple personalities with Self, who summarized the discussion:

> Will James was 'king of the cowboys' and had written 24 books, and was a boyhood hero and fantasy object of [Panetti's]. He described Sergeant Iron Horse ["Sarge"] as having begun as a childhood fantasy of 'the eternal mercenary' but later in life having been a manifestation of mental illness, and that the mental illness was a manifestation of spiritual wickedness. . . . He claims that command type hallucinations from Sergeant Iron Horse were partially responsible for his having murdered his in-laws. He also reported that he heard 'demons cackling' after the murders, and that those same demons cackled at Jesus' crucifixion.

*Id.* at 33.

In contrast to the bizarre behavior Panetti often exhibited were the eleven hours of recorded conversations between Panetti and his family reviewed by this Court, during which Panetti was unaware he was being recorded. During the full eleven hours, Panetti's speech remained "normal, even slow, in pace." *Id.* at 46. His statements were "responsive"; he showed "remarkable self-

centeredness"; and, tellingly, he engaged in "extended discussion regarding [the state trial court judge] and his corruptness and ineptitude with regard to Panetti's trial proceedings." *Id.* at 47. He often discussed his then-pending habeas proceedings with his family, and demonstrated a "fairly sophisticated" understanding of his circumstances, including the legal issues in his case and how his case would be affected by pending Supreme Court decisions. In one instance, he told his parents they did not need to worry about the outcome of the 2008 evidentiary hearing, as even if he lost, "it's gonna be better in the end, because it [the case]'s gonna go back [to the Supreme Court] again and they're not gonna like it. They've done that with other cases, and the Supreme Court gets angry with Texas for doing that." *Id.* at 48.

Further, Panetti's behavior when interacting with the experts for the State versus his own experts revealed his rational understanding that the question upon which his execution hinged was his sanity or lack thereof. Panetti refused to cooperate with the State's experts, while he cooperated with his own experts without incident. During the recorded conversations referenced above, Panetti asked his parents whether a certain expert was "for us or them," and when told the expert was "for us," expressed satisfaction he had treated the expert as though the expert was on his side. *See id.* at 60.

Following the evidentiary hearing, this Court concluded "it is not seriously disputable that Panetti suffers from paranoid delusions of some type, and these delusions may well have contributed to [the 1992 murders]. However, it is equally apparent from his recorded conversations with his parents that these delusions do not prevent him from having both a factual and rational understanding that he committed those murders, was tried and convicted, and is sentenced to die for them." *Id.* at 62. Nothing Panetti has presented at this new threshold suggests the Court might deviate from that

assessment. Were this a case with a less-developed factual record, this Court's decision might well be different; however, in light of the history of this case and in consideration of the evidence Panetti has placed before the Court, the Court concludes Panetti's attempt to begin the cycle of litigation afresh should be rejected.

The Court notes its discussion of what Panetti now terms "the *Ford* conundrum" in its March 26, 2008 Order:

> The history of Eighth Amendment jurisprudence regarding the execution of the insane has always included the twin ideas that a prisoner who was formerly competent to stand trial may later become incompetent to be executed; but if an insane prisoner condemned to be executed regains his sanity, the execution shall proceed. . . .
>
> It is . . . well-settled that a claim of incompetence to be executed must be evaluated at the time execution is "imminent," regardless of a prisoner's prior mental state. Respectfully, this Court notes the "contemporaneous" nature of the competence-to-be-executed inquiry highlights a significant problem in this area of the Supreme Court's capital punishment jurisprudence. Many inmates on death row suffer from some form of mental illness, commonly schizophrenia or a related disorder. Therefore, the *Panetti* Court's requirement of a "documented mental illness" is no real gatekeeper to potentially endless competency litigation.
>
> Once a prisoner has satisfied the threshold showing necessary to open an inquiry into his competence to be executed, where and when does that inquiry end? The initial finding that Panetti was competent to be executed in 2004 wound its way through the appellate process until 2007, and this passage of time now requires at least some fresh inquiry into Panetti's mental state. If the present determination (whatever the result) is appealed, will the Court have to conduct a third factual inquiry regarding Panetti's competence to be executed three or four years in the future? What is the evidentiary value of the record of prior competency-to-be-executed inquiries in that case?

*Id.* at 54–56. As forecasted, the appellate process following this Court's 2008 decision Panetti was competent to be executed was lengthy and complicated by the intervening *Edwards* and *Chadwick* decisions. However, even had the appellate process concluded in two years or in one year, would

it be fair to say the prior determination of competency made a year or two before was rendered "at the time execution is 'imminent'?"

The *Ford* Court, too, was cognizant of the problem; Justice Thurgood Marshall states in his opinion for the plurality "[i]t may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of nonmeritorious *or repetitive* claims of insanity." *Ford*, 477 U.S. at 417 (emphasis added). Panetti himself states in his motion presently before the Court that the problem is "adequately" tempered by the requirement of the threshold preliminary showing. Mot. Stay Execution [#176] at 6. While the Court has its doubts regarding the "adequacy" of the solution, the undersigned does agree with Justice Marshall that "some high threshold showing" is "necessary" to ensure a prisoner cannot endlessly and repetitively litigate his claims of insanity. Further, it seems to the Court Panetti's is a parade case illustrating that need, as Panetti has been repeatedly examined over many years by numerous mental health professionals, the reports of whom have been extensively examined by this Court alongside a wealth of additional evidence, including the opinions of experts retained to opine on such matters as the degree to which psychiatry can assist a court in determining a person's rational understanding of anything, the testimony of laypersons in close contact with Panetti over the years, and Panetti's own statements.

Conducting a fresh inquiry into Panetti's mental state at the threshold, the Court finds Panetti has failed to make the necessary showing of incompetency warranting, for the third time, appointment of counsel, authorization of funds to hire mental health experts, and a stay of execution. Panetti has extensively litigated this issue, and has presented no evidence of incompetence different in kind from that previously considered and ultimately rejected by this and other Courts.

Accordingly:

IT IS ORDERED that Petitioner Scott Panetti's Motion for Stay of Execution [#176] is DENIED;

IT IS FURTHER ORDERED that Petitioner's Corrected Motion for Authorization of Funds Under 18 U.S.C. § 3599 to Hire Mental Health Expert and Investigator [#180] is DENIED; and

IT IS FINALLY ORDERED that Petitioner's Motion for Appointment of Counsel [#177] is DENIED.

SIGNED this the 26th day of November 2014 at 2:00 p.m.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE