# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| SCOTT LOUIS PANETTI<br>Petitioner<br><br>V.<br><br>BOBBY LUMPKIN,<br>Director, Texas Department<br>of Criminal Justice,<br>Correctional Institutions<br>Division<br>    Respondent. | §§§§§§§§§§§§ CASE NO. 1:04-CV-00042-RP<br><br>* DEATH PENALTY CASE * |

## ADVISORY ON REOPENING FEDERAL PROCEEDINGS

On June 23, 2021, the Texas Court of Criminal Appeals (CCA) dismissed Scott Panetti's Subsequent Application for Writ of Habeas Corpus based on false scientific testimony about future dangerousness. Ex. 1. That same day, the CCA denied Scott Panetti's Suggestion for Reconsideration based on an earlier claim raising an Eighth Amendment violation under *Indiana v. Edwards*, 554 U.S. 164 (2008). Ex. 2. Under the procedures set out in this Court's orders of October 22, 2018, and May 21, 2021, Scott Panetti must return to federal court within 45 days of the state court's denial of his claims. ECF Nos. 208, 237. Before the parties submit a joint proposed scheduling order, however, this Court should address the recent disclosure of evidence that calls into question the integrity of the 2008 federal evidentiary hearing on Scott Panetti's competency-to-be-executed claim.

1

On March 31, 2021, the Florida Department of Health issued an order imposing an emergency restriction on Dr. Alan J. Waldman's license to practice as a medical doctor. Ex. 3. The State of Texas had retained Dr. Waldman in 2007 to evaluate Scott Panetti for execution competency and testify as its expert at the 2008 federal evidentiary hearing. The Department of Health found that Dr. Waldman has been addicted to opioid pain medication, including oxycodone and hydrocodone, for at least the past 19 years. *Id.* at ¶¶ 3–7. The Department of Health noted that abuse of oxycodone and hydrocodone can lead to "severe psychological or physical dependence." *Id.* at ¶ 3 nn.1, 2. In addition, the Department of Health found that when Dr. Waldman worked as a forensic neuropsychiatrist, he "would occasionally take narcotic medication prior to testifying to avoid experiencing symptoms of withdrawal while testifying." *Id.* at ¶ 11. A physician specializing in addiction medicine evaluated Dr. Waldman and found that "Dr. Waldman's consumption of high-dose opioid over the course of decades, in addition to his prescribed psychoactive and potentially neurotoxic agents such as Adderall and Valium, could affect Dr. Waldman's neurological health." *Id.* at ¶ 22. The addiction medicine specialist concluded that "Dr. Waldman is unable to practice as a medical doctor with reasonable skill and safety to patients." *Id.* at ¶ 24.

In the 2008 evidentiary hearing, the Honorable Sam Sparks placed great weight on Dr. Waldman's testimony in finding that Scott Panetti had a rational understanding of the connection between his crime and his punishment. *Panetti v.*

*Quarterman*, No.A-04-CA-042-SS, 2008WL2338498, at *24–*26, *36 (W.D. Tex. Mar. 26, 2008). Judge Sparks explained that:

> Panetti has often expressed his feeling that the death penalty is wrong in his case because he was schizophrenic when he killed his in-laws. As he told Dr. Waldeman [sic], "You treat mental illness." In other words, Panetti understands he is being executed to punish him for killing his in-laws, but feels the state is not justified in taking this position because of his mental illness.
>
> ….
>
> [H]is delusions do not prevent his rational understanding of the causal connection between those murders and his death sentence, and he in fact has such an understanding. Panetti's understanding of the causal connection between his crime and his punishment is most clearly demonstrated by his rationally articulated position that the punishment is unjustified: He believes the State should not execute him because he was mentally ill when he committed the murders. This position is based on and necessarily indicates a rational understanding that the State intends to execute him because he committed the murders.

*Id.* at *36 (citation omitted). Upholding the district court's denial of the *Ford* claim, the Fifth Circuit gave "great deference" to Judge Sparks's decision crediting Dr. Waldman's testimony that Scott Panetti's belief he should not be executed because he was mentally ill when he committed the murders demonstrates his rational understanding. *Panetti v. Stephens*, 727 F.3d 398, 410–11 (5th Cir. 2013) (internal quotation marks omitted).

## CONCLUSION

The recent order of the Florida Department of Health regarding the decades' long opioid addiction of Dr. Waldman raises troubling questions, including whether his participation in Scott Panetti's case caused a defect in the integrity of these federal habeas corpus proceedings. For this reason, Counsel for Scott Panetti asks for 30 days to file a motion in this Court seeking relief related to the evidence contained

3

in the order imposing an emergency restriction on Dr. Waldman's medical license. The State is not opposed to this proposal.

        Respectfully submitted,

        *s/ Gregory W. Wiercioch*
        GREGORY W. WIERCIOCH

        Counsel for Petitioner Scott Louis Panetti
        Texas Bar No. 00791925

        Frank J. Remington Center
        University of Wisconsin Law School
        975 Bascom Mall
        Madison, Wisconsin 53706
        wiercioch@wisc.edu
        (832) 741-6203
        (608) 263-3380 (FAX)

        Maureen Scott Franco
        Federal Public Defender

        *s/ Tivon Schardl*
        TIVON SCHARDL

        Counsel for Petitioner Scott Louis Panetti
        Bar Number: Florida 73016

        Supervisory Federal Public Defender
        Capital Habeas Unit
        Western District of Texas
        Lavaca Plaza
        504 Lavaca St., Ste. 960
        Austin, Texas 78701
        (512) 916-5025
        (512) 916-5035 (FAX)

## **CERTIFICATE OF SERVICE**

  I certify that on this 9th day of August 2021, I electronically filed the foregoing advisory with the clerk of the court for the U.S. District Court, Western District of Texas, using the electronic case filing system. A "Notice of Electronic Filing" was sent to Counsel for Respondent at the following e-mail address:

Rachel L. Patton
Assistant Attorney General
rachel.patton@oag.texas.gov

                    *s/ Gregory W. Wiercioch*



# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### NO. WR-37,145-05

### EX PARTE SCOTT LOUIS PANETTI, Applicant

### ON APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS IN CAUSE NO. 3310-D IN THE 216TH JUDICIAL DISTRICT COURT GILLESPIE COUNTY

*Per curiam.*

### O R D E R

This is a subsequent application for a writ of habeas corpus filed pursuant to the provisions of Texas Code of Criminal Procedure Article 11.071 § 5.

In September 1995, a jury found Applicant guilty of the offense of capital murder. The jury answered the special issues submitted pursuant to Texas Code of Criminal Procedure Article 37.071, and the trial court, accordingly, set Applicant's punishment at death. This Court affirmed Applicant's conviction and sentence on direct appeal. *Panetti v. State*, No. AP-72,230 (Tex. Crim. App. Dec. 3, 1997) (not designated for publication).

**EX. 1**

Panetti - 2

This Court denied relief on Applicant's initial post-conviction application for a writ of habeas corpus. *Ex parte Panetti*, No. WR-37,145-01 (Tex. Crim. App. May 28, 1998)(not designated for publication). This Court also dismissed three subsequent applications for writs of habeas corpus because they failed to meet the dictates of Article 11.071 § 5. *Ex parte Panetti*, No. WR-37,145-02 (Tex. Crim. App. Oct. 21, 2009)(not designated for publication), 326 S.W.3d 615 (Tex. Crim. App. 2010), and No. WR-37,145-04 (Tex. Crim. App. 2014). Applicant filed this, his fourth subsequent application, in the trial court on December 2, 2019.

In this application, Applicant asserts that his death sentence "violates due process because it was secured through false scientific testimony about his future dangerousness." We have reviewed the application and find that Applicant has failed to satisfy the requirements of Article 11.071 § 5. Accordingly, we dismiss the application as an abuse of the writ without reviewing the merits of the claim. Art. 11.071 § 5(c).

IT IS SO ORDERED THIS THE 23RD DAY OF JUNE, 2021.

Do Not Publish

**EX. 1**

OFFICIAL NOTICE FROM COURT OF CRIMINAL APPEALS OF TEXAS
P.O. BOX 12308, CAPITOL STATION, AUSTIN, TEXAS 78711

6/23/2021
**PANETTI, SCOTT LOUIS     Tr. Ct. No. 3310-B        WR-37,145-02**
This is to advise that the applicant's suggestion for reconsideration has been denied without written order.

Deana Williamson, Clerk

SCOTT LOUIS PANETTI
C/O GREGORY W. WIERCIOCH
UNIVERSIT OF WISCONSIN LAW SCHOOL
975 BASCOM MALL
MADISON, WI 53706

**EX. 2**

Final Order No. DOH-21-0333-PC-MQA

FILED DATE - MAR 3 1 2021
Department of Health

By: [signature]
Deputy Agency Clerk

# STATE OF FLORIDA
# DEPARTMENT OF HEALTH

In Re: Emergency Restriction of the License of
Alan J. Waldman, M.D.
License No.: ME 51766
Case Number: 2021-03117

## ORDER OF EMERGENCY RESTRICTION OF LICENSE

Scott A. Rivkees, M.D., State Surgeon General, ORDERS the emergency restriction of the license of Alan J. Waldman, M.D., (Dr. Waldman) to practice as a medical doctor in the State of Florida. Dr. Waldman holds license number ME 51766. His address of record is 10046 Southwest 44th Lane, Gainesville, Florida 32608. The following Findings of Fact and Conclusions of Law support the emergency restriction of Dr. Waldman's license to practice as a medical doctor in the State of Florida.

## FINDINGS OF FACT

1. The Department of Health (Department) is the state agency charged with regulating the practice of medicine pursuant to chapters 20, 456, and 458, Florida Statutes (2020). Section 456.073(8), Florida Statutes (2020), authorizes the Department to summarily restrict Dr. Waldman's license to practice as a medical doctor in the State of Florida, in accordance with section 120.60(6), Florida Statutes (2020).

EX. 3

In Re: Emergency Restriction of the License of
Alan J. Waldman, M.D.
License No.: MD 51766
Case Number: 2021-03117

2. At all times material to this Order, Dr. Waldman was licensed to practice as a medical doctor in the State of Florida, pursuant to chapter 458.

3. In the 1990s, Dr. Waldman suffered from multiple medical conditions that caused pain. Dr. Waldman received pain management treatment and was treated with various controlled substances and legend drugs, including oxycodone[1] and hydrocodone,[2] for his medical conditions.

4. In May 2002, Dr. Waldman underwent a comprehensive pain management evaluation with John B. Hunt, M.D., (Dr. Hunt) due to his chronic pain.

5. Dr. Hunt opined that Dr. Waldman experienced opioid adaption and tolerance with an increased use of schedule III narcotics to control pain.

6. Dr. Hunt recommended that Dr. Waldman undergo treatment at a multidisciplinary tertiary care facility and receive care from Dr. Robert Guskiewicz, M.D., a physician specializing in pain management.

---

[1] Oxycodone is commonly prescribed to treat pain. According to section 893.03(2), Florida Statutes (2001-2020), oxycodone is a Schedule II controlled substance that has a high potential for abuse and has a currently accepted but severely restricted medical use in treatment in the United States. Abuse of oxycodone may lead to severe psychological or physical dependence.

[2] Hydrocodone is commonly prescribed to treat pain. According to section 893.03(2), hydrocodone is a Schedule II controlled substance that has a high potential for abuse and has a currently accepted but severely restricted medical use in treatment in the United States. Abuse of hydrocodone may lead to severe psychological or physical dependence.

EX. 3

In Re:  Emergency Restriction of the License of
Alan J. Waldman, M.D.
License No.:  MD 51766
Case Number: 2021-03117

7.  For approximately 19 years, Dr. Waldman received pain management care from Dr. Guskiewicz.

8.  From approximately 2011 to 2019, Dr. Waldman was prescribed oxycodone, MS Contin,[3] Adderall[4] and Valium.[5]

9.  Dr. Waldman took Adderall 60 mg in the morning, MS Contin 600 mg and oxycodone 60 mg after work, MS Contin 300 mg and oxycodone 60 mg after dinner, and Valium 30 mg before bed.

10.  In 2019, Dr. Waldman transferred care to Mark Jackson, M.D., (Dr. Jackson) a physician specializing in addiction medicine.

11.  Dr. Waldman reported that he worked as a forensic neuropsychiatrist and would occasionally take narcotic medication prior to testifying to avoid experiencing symptoms of withdrawal while testifying.

---

[3] MS Contin is the brand name for a drug that contains morphine and is prescribed to treat pain. According to Section 893.03(2), morphine is a Schedule II controlled substance that has a high potential for abuse and has a currently accepted but severely restricted medical use in treatment in the United States. Abuse of morphine may lead to severe psychological or physical dependence.

[4] Adderall is the brand name for a drug that contains amphetamine, commonly prescribed to treat attention deficit disorder. According to section 893.03(2), amphetamine is a Schedule II controlled substance that has a high potential for abuse and has a currently accepted but severely restricted medical use in treatment in the United States. Abuse of amphetamine may lead to severe psychological or physical dependence.

[5] Valium is the brand name for diazepam and is prescribed to treat anxiety. According to section 893.03(4), Florida Statutes (2010-2020), diazepam is a Schedule IV controlled substance that has a low potential for abuse relative to the substances in Schedule III and has a currently accepted medical use in treatment in the United States. Abuse of diazepam may lead to limited physical or psychological dependence relative to the substances in Schedule III.

EX. 3

In Re: Emergency Restriction of the License of
Alan J. Waldman, M.D.
License No.: MD 51766
Case Number: 2021-03117

12. On or about May 18, 2020, Dr. Jackson referred Dr. Waldman to the Professional Resources Network (PRN[6]) based on Dr. Waldman's medication use and misuse. Dr. Jackson stated that Dr. Waldman works in a "safety sensitive position" and is in great risk of overdose due to the combination of his medications.

13. Dr. Jackson recommended that Dr. Waldman undergo detoxification.

14. On or about August 10, 2020, Dr. Waldman entered Gateway Community Services for detoxification treatment.

15. On August 14, 2020, Dr. Waldman discontinued his detoxification treatment against medical advice.

16. On or about August 25, 2020, Dr. Waldman informed PRN that he became very ill while in treatment and could not tolerate the severity of the opioid withdrawal symptoms.

---

[6] The Professional Resource Network is the impaired practitioner program for the Board of Medicine, pursuant to section 456.073, Florida Statutes (2019-2020). PRN monitors the evaluation, care, and treatment of impaired practitioners licensed by the Department. PRN oversees random drug screens and provides for the exchange of information between treatment providers, evaluators, and the Department for the protection of the public.

4

EX. 3

In Re: Emergency Restriction of the License of
Alan J. Waldman, M.D.
License No.: MD 51766
Case Number: 2021-03117

17. On September 28, 2020, Dr. Waldman entered into another detoxification program at Stepping Stone Center for Recovery (Stepping Stone).

18. On or about October 5, 2020, Stepping Stone discharged Dr. Waldman. He was diagnosed with moderate opioid use disorder; mild sedative, hypnotic, or anxiolytic use disorder; and unspecified stimulant use disorder.

19. Stepping Stone opined that Dr. Waldman is unsafe to practice medicine with reasonable skill and safety to patients.

20. On November 30, 2020, Jamie Smolen, M.D., (Dr. Smolen) a physician specializing in addiction medicine, evaluated Dr. Waldman, pursuant to PRN and Lakeview Health's requests.

21. During the evaluation, Dr. Waldman stated that he is prescribed Adderall but has stopped taking it. Dr. Elias Sarkis, Dr. Waldman's treating physician, stated that it was prescribed to overcome sedation from the other narcotic medications that Dr. Waldman is prescribed.

22. Dr. Smolen opined that Dr. Waldman's consumption of high-dose opioid over the course of decades, in addition to his prescribed psychoactive

**EX. 3**

In Re: Emergency Restriction of the License of
Alan J. Waldman, M.D.
License No.: MD 51766
Case Number: 2021-03117

and potentially neurotoxic agents such as Adderall and Valium, could affect Dr. Waldman's neurological health.

23. Dr. Smolen diagnosed Dr. Waldman with moderate opioid use disorder, mild sedative/hypnotic/anxiolytic use disorder, and unspecified stimulant use disorder.

24. Dr. Smolen opined that Dr. Waldman is unable to practice as a medical doctor with reasonable skill and safety to patients.

25. Dr. Smolen recommended that Dr. Waldman enter into treatment at a residential or partial hospitalization program (PHP) level of care with a housing component at a facility with expertise in treating healthcare professionals, undergo a neuropsychological evaluation with neurocognitive testing, and undergo a chronic pain evaluation.

26. On or about January 22, 2021, PRN requested Dr. Waldman to submit a voluntary withdrawal from practice.

27. As of the date of this Order, Dr. Waldman has failed to return a voluntary withdrawal from practice and has failed to engage in the recommended treatment.

**EX. 3**

In Re: Emergency Restriction of the License of
Alan J. Waldman, M.D.
License No.: MD 51766
Case Number: 2021-03117

28. In the course of their practice, medical doctors are entrusted with the lives of patients. Medical doctors must possess good judgment, be able to recognize abnormal signs or symptoms of patients, and provide emergency care when needed. As such, physical and mental stability are essential traits that medical doctors must possess in order to competently practice their profession because even the smallest error in judgment can be fatal. It is crucial that the judgment and critical thinking skills of a medical doctor are not impaired in high pressure situations.

29. An independent medical expert has determined that Dr. Waldman is unable to practice as a medical doctor with reasonable skill and safety to patients due to his moderate opioid use disorder, mild sedative/hypnotic/anxiolytic use disorder, and unspecified stimulant use disorder. Based on that opinion and Dr. Waldman's failure to return a voluntary withdrawal from practice and failure to engage in the recommended treatment, there are no less-restrictive means than the terms outlined in this Order which will adequately protect the public.

EX. 3

In Re: Emergency Restriction of the License of
Alan J. Waldman, M.D.
License No.: MD 51766
Case Number: 2021-03117

## CONCLUSIONS OF LAW

Based on the foregoing Findings of Fact, the State Surgeon General concludes as follows:

1. The State Surgeon General has jurisdiction over this matter pursuant to sections 20.43 and 456.073(8) and chapter 458, as set forth above.

2. Section 458.331(1)(s), Florida Statutes (2020), authorizes discipline, including restriction, against a medical doctor for being unable to practice as a medical doctor with reasonable skill and safety to patients by reason of illness or use of alcohol, drugs, narcotics, or chemicals or any other type of material or as a result of any mental or physical condition.

3. Dr. Waldman violated section 458.331(1)(s) by being unable to practice as a medical doctor with reasonable skill and safety to patients due to his moderate opioid use disorder, mild sedative/hypnotic/anxiolytic use disorder, and unspecified stimulant use disorder.

4. Section 120.60(6) authorizes the State Surgeon General to summarily restrict a medical doctor's license upon a finding that the medical

EX. 3

In Re: Emergency Restriction of the License of
Alan J. Waldman, M.D.
License No.: MD 51766
Case Number: 2021-03117

doctor presents an immediate, serious danger to the public health, safety, or welfare.

5.  Dr. Waldman's continued unrestricted practice as a medical doctor constitutes an immediate, serious danger to the health, safety, or welfare of the citizens of the State of Florida, and this summary procedure is fair under the circumstances to adequately protect the public.

**WHEREFORE**, in accordance with section 120.60(6), it is **ORDERED THAT**:

1.  The license of Alan J. Waldman, M.D., to practice as a medical doctor, license number ME 51766, is immediately restricted to prohibit Dr. Waldman from practicing as a medical doctor until PRN or a PRN-approved evaluator notifies the Department that he is safe to return to the practice of medicine.

2.  A proceeding seeking formal discipline of the license of Alan J. Waldman, M.D., to practice as a medical doctor in the State of Florida will be promptly instituted and acted upon in compliance with sections 120.569 and 120.60(6), Florida Statutes (2020).

**EX. 3**

In Re: Emergency Restriction of the License of
Alan J. Waldman, M.D.
License No.: MD 51766
Case Number: 2021-03117

**DONE and ORDERED** this 31st day of March, 2021.

_____
Scott A. Rivkees, M.D.
State Surgeon General

PREPARED BY:
Gerald C. Henley, II, Esq.
Assistant General Counsel
Department of Health
Prosecution Services Unit
4052 Bald Cypress Way, Bin C-65
Tallahassee, FL 32399-3265
(850) 558-9832 TELEPHONE
(850) 245-4684 FAX
Florida Bar No. 1005574
Gerald.Henley@flhealth.gov

**EX. 3**

In Re: Emergency Restriction of the License of
Alan J. Waldman, M.D.
License No.: MD 51766
Case Number: 2021-03117

## **NOTICE OF RIGHT TO JUDICIAL REVIEW**

Pursuant to sections 120.60(6) and 120.68, Florida Statutes (2020), the Department's findings of immediate danger, necessity, and procedural fairness shall be judicially reviewable. Review proceedings are governed by the Florida Rules of Appellate Procedure. Such proceedings are commenced by filing a Petition for Review, in accordance with Florida Rule of Appellate Procedure 9.100, and accompanied by a filing fee prescribed by law with the District Court of Appeal, and providing a copy of that Petition to the Department of Health within thirty (30) days of the date this Order is filed.

**EX. 3**