# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **SCOTT LOUIS PANETTI,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. A-04-CA-042-RP** |
| | § | |
| **BOBBY LUMPKIN, Director,** | § | **\* DEATH PENALTY CASE \*** |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

## MEMORANDUM OPINION AND ORDER ON REMAND

This case is on remand from the Fifth Circuit Court of Appeals to once again determine whether death row inmate Scott Panetti is competent to be executed. *Panetti v. Davis*, 863 F.3d 366, 378 (5th Cir. 2017).  To that end, this Court held a three-day evidentiary hearing where both parties presented evidence and testimony regarding Panetti's current mental state.  Having heard the testimony and reviewed the exhibits and pleadings of both parties, the Court finds that Panetti lacks a rational understanding of the connection between his offense and his sentence of death and that his execution would therefore violate the Eighth Amendment's prohibition on cruel and unusual punishment.

## I.  Background

### A.    Panetti's Mental Health History

Panetti has a long and well-documented history of mental illness and institutionalization that began in the late 1970s when he was 18 years old.[1]  His first documented contact with mental

---

[1]    This history was recounted in detail in the district court's Order dated March 26, 2008 (ECF No. 145 at 5-14), as well as in the expert reports provided to the Court during its most recent evidentiary hearing.  *See* ECF Nos. 314-2 at 1703-16 (Report of Dr. Bhushan Agharkar), 1723-30 (Report of Dr. Stephen Marder); ECF No. 314-3 at 1-44 (Report of Dr. Timothy Proctor).

health professionals occurred in November 1976 while Panetti was serving in the Navy.  He was diagnosed with depression and insomnia prior to being honorably discharged in 1977.  A year later, after being hospitalized for sustaining an injury while working as a utility lineman, Panetti was diagnosed with sociopathic personality disorder with the possibility of early schizophrenia. Although his physician recommended a psychiatric follow up, Panetti was discharged with no further instructions on psychiatric care once his injury healed.

Panetti was first committed to a psychiatric hospital in 1981 at age 23 for substance abuse. While he was diagnosed with alcohol dependence and dependent personality disorder, Panetti also displayed grandiose, delusional, and paranoid thoughts.  Panetti was later diagnosed with chronic schizophrenia in 1986 at age 28 while a patient at the Kerrville State Psychiatric Hospital and the Starlite Village Alcohol and Drug Abuse Treatment Center.  Treating physicians described Panetti as "clearly delusional" and observed that Panetti was "psychotic and most likely had been for years."  Panetti's first wife described some of his delusional behavior as revolving around a belief that the devil had possessed their home and furniture.  At one point, Panetti buried a number of valuables next to the house, stacked other valuables above ground and washed them with water, and engaged in other rituals in an effort to cleanse their surroundings of evil.  In 1988, the Social Security Administration for Texas State Disability Services diagnosed Panetti with chronic undifferentiated schizophrenia and determined that he was incompetent to manage his own affairs.

In all, between 1981 and 1992, Panetti was hospitalized fourteen times in six different facilities for various mental health reasons, including symptoms of schizophrenia, manic depression, and paranoid delusions.  Among other things, he has been diagnosed with sociopathic personality disorder, severe schizophrenia, and schizoaffective disorder.  He was also repeatedly hospitalized for alcohol and drug abuse, which aggravated his underlying mental illness.

**B.**     **The Crime and Subsequent Trial**

In August 1992, Panetti's second wife, Sonja, separated from Panetti due to his drinking and violent behavior against her and their three-year old daughter.  Sonja took their daughter and moved in with her parents, Joe and Amanda Alvarado, who lived nearby.  During this time, Panetti threatened to kill Sonja and her parents, and assaulted Sonja's father on at least one occasion. Based on this behavior, Sonja obtained a protective order against Panetti on September 2, 1992. Six days later, Panetti drove to his in-law's house and murdered them in front of his wife and daughter.  He then took his wife and daughter hostage for the night before eventually surrendering to police.[2]  Panetti was indicted for capital murder shortly thereafter.

Prior to trial, the state trial court held two hearings on the issue of Panetti's competency. The first jury was unable to reach a decision and the trial court granted a mistrial.  Despite his past mental health history and a psychiatric evaluation indicating that Panetti suffered from a fragmented personality, delusions, and hallucinations, a second jury found Panetti competent to stand trial.  Panetti then fired his attorneys and sought to represent himself at trial.  He believed God had cured him of his mental illness on April Fool's Day in 1995, so he stopped taking any medication and began preaching the word of God.  Because he had previously been found competent to be tried, the trial court approved Panetti's request to represent himself, but nevertheless appointed standby counsel to assist Panetti in his defense.

Panetti's trial took place in September 1995, where his mental health issues were on full display.  Representing himself, Panetti wore a burgundy cowboy costume and rambled incessantly throughout the entire trial.   The only defense he raised was insanity, referring to a separate

---

[2]      A more detailed summary of the murders can be found in the Texas Court of Criminal Appeals' opinion on direct appeal.  *See Panetti v. State,* No. 72,230, slip op. at 2-5 (Tex. Crim. App. 1997).

personality he identified as "Sarge Iron Horse" whom he indicated was responsible for the murders.  To support his defense, Panetti attempted to subpoena a number of notable witnesses, including Jesus Christ, Pope John Paul II, John F. Kennedy, and actress Anne Bancroft.  Of the witnesses who did appear, Panetti questioned them with incomprehensible inquiries and focused excessively on irrelevant details.  According to standby counsel, Panetti's behavior made it evident that he was mentally incompetent, rendering the trial "a judicial farce, and a mockery of self-representation."  *Panetti v. Quarterman*, 551 U.S. 930, 936 (2007).

The jury found Panetti guilty of capital murder and sentenced him to death.  The Texas Court of Criminal Appeals upheld his conviction and sentence on direct appeal and rejected Panetti's request for state habeas corpus relief.  *See Panetti v. State,* No. 72,230 (Tex. Crim. App. Dec. 3, 1997); *Ex parte Panetti,* No. 37,145-01 (Tex. Crim. App. May 20, 1998).  Panetti's attempt to obtain federal habeas corpus relief was similarly unsuccessful, culminating in the Supreme Court's denial of Panetti's petition for certiorari in December 2003.  *Panetti v. Dretke,* 540 U.S. 1052 (2003).

## C.    Panetti's *Ford* Proceedings

To this point, Panetti had not argued that his mental illness rendered him incompetent to be executed under *Ford v. Wainwright*, 477 U.S. 399 (1986).  Instead, the only issues relevant to Panetti's mental health raised during his state and federal habeas proceedings involved Panetti's competency to stand trial and waive counsel.  This soon changed when the trial court set Panetti's first execution date in October 2003.

Since that time, Panetti's competency for execution has been prolifically litigated, having been the subject of numerous collateral review proceedings in both state and federal court spanning the better part of two decades.  While there is no need to recount in detail the specifics of this

lengthy procedural history,[3] suffice it to say that Panetti's mental health has been evaluated by a multitude of experts and courts—state and federal—and that the literature on this topic is voluminous, to put it mildly.

Most recently, Panetti sought a stay of a December 2014 execution date in state court to allow him more time to litigate the issue of competency to be executed under Article 46.05 of the Texas Rules of Criminal Procedure. The state court denied his request, and the Texas Court of Criminal Appeals affirmed the denial on the grounds it lacked jurisdiction. *See* Mot. Stay Execution (ECF No. 176-1 at 2, 6). Following the denial of these motions in state court, Panetti sought in federal court the same relief the state courts declined to provide—a stay of his execution date (ECF No. 176), the appointment of counsel (ECF No. 177), and the authorization of funding for investigative and expert assistance (ECF Nos. 178, 180). On November 26, 2014, after conducting a threshold inquiry[4] into Panetti's mental state, the district court, the Honorable Judge Sam Sparks presiding, denied Panetti's request, finding Panetti failed to make the necessary showing of incompetence necessary to trigger the protections of *Ford*. (ECF No. 182).

On appeal, the Fifth Circuit stayed Panetti's execution and set the case for argument. After considering the supplemental briefing and argument of the parties, the Fifth Circuit vacated the district court's findings on the merits of Panetti's *Ford* claim as premature and reversed the denial of counsel and expert funding. *Panetti*, 863 F.3d at 378. The case was also remanded to the district court "with instructions to appoint counsel, authorize funding for investigative and expert

---

[3]       The Fifth Circuit expounded on Panetti's *Ford* litigation history in its 2017 opinion remanding this case for further proceedings. *See Panetti*, 863 F.3d at 369-70. The district court has also previously chronicled this history in its Order dated March 26, 2008 (ECF No. 145 at 23-29) and Order dated November 26, 2014 (ECF No. 182 at 2-7).

[4]       This inquiry included reviewing new evidence of Panetti's incompetence, as well as the abundance of evidence on the issue of Panetti's competency that had previously been amassed in this case following two separate, but equally extensive, evidentiary hearings on the matter held in September 2004 and February 2008.

assistance, and conduct any further proceedings to determine *afresh* Panetti's competency to be executed." *Id.* (emphasis added).

In light of this remand, this Court determined another evidentiary hearing—Panetti's third in federal court—was necessary to determine whether Panetti is currently competent to be executed under *Ford*. This hearing was held October 24-26, 2022, and both parties submitted evidence and presented testimony from several expert and lay witnesses. Now that the parties have submitted their post-hearing briefs (ECF Nos. 323, 325), the issue of whether Panetti is currently competent to be executed is ripe for determining.[5]

## II. <u>Standard for Determining Competency</u>

It is well-established that the Eighth Amendment's prohibition on cruel and unusual punishment prohibits the execution of a prisoner who is incompetent. *Panetti v. Quarterman*, 551 U.S. 930 (2007); *Ford*, 477 U.S. at 399. Among the various rationales for this constitutional restriction is that the execution of a prisoner who cannot comprehend the reasons for his punishment "offends moral values" and "serves no retributive purpose." *Madison v. Alabama*, 139 S. Ct. 718, 722-23 (2019) (citing *Panetti*, 551 U.S. at 958). To be considered competent for execution, a prisoner must be able to "reach a rational understanding of the reason for [his] execution." *Panetti*, 551 U.S. at 958, 960-61 (noting that "[g]ross delusions stemming from a severe mental disorder may put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose.").

---

[5]     Fifth Circuit precedent indicates that a petitioner's *Ford* claim normally does not become ripe until after an execution date has been scheduled. *ShisInday v. Quarterman*, 511 F.3d 514, 521-22 (5th Cir. 2007) (holding that the setting of an execution date "causes a *Ford*-based incompetency claim to become ripe.") (citing *Stewart v. Martinez-Villareal*, 523 U.S. 637, 643, (1998)). In this case, an execution date was originally scheduled in 2014 prior to the Fifth Circuit staying the execution date and ultimately remanding the case with instructions to "conduct any further proceedings to determine afresh [Petitioner]'s competency to be executed." *Panetti*, 863 F.3d at 378. Because the Fifth Circuit specifically remanded for a competency determination, and both parties have represented to the Court that they consider Petitioner's execution imminent (ECF No. 250 at 4-5), the Court will consider Petitioner's *Ford* claim to be ripe for review.

In determining whether a prisoner is competent to be executed, "[t]he critical question is whether a 'prisoner's mental state is so distorted by a mental illness' that he lacks a 'rational understanding' of 'the State's rationale for [his] execution.'"  *Madison*, 139 S. Ct. at 723 (citing *Panetti*, 551 U.S. at 958-59).  This "rational understanding" test—which seeks to determine whether a prisoner has a rational understanding of his crime, his impending death, and the causal relationship between the two—has repeatedly been used by the Fifth Circuit to determine competency for execution.  *See Panetti*, 863 F.3d at 369 (reiterating that a prisoner must have a "rational understanding" of the State's reasons for executing him); *Panetti v. Stephens,* 727 F.3d 398, 410 (5th Cir. 2013) (finding that the district court applied the correct standard when it determined that a condemned inmate must possess "both a factual and rational understanding of his crime, his impending death, and the causal retributive connection between the two").[6]

Finally, inquiries into whether a prisoner is competent to be executed hinge on a prisoner's mental state at the time an execution is imminent.  *Ford*, 477 U.S. at 407.  Because such inquiries are an evaluation of a prisoner's *current* mental condition, "[p]rior findings of competency do not foreclose a prisoner from proving he is incompetent to be executed because of his present mental condition."  *Panetti,* 551 U.S. at 934-35.  However, a court may consider a prisoner's mental-health history when determining competency, as such history may be relevant to the ultimate question of the prisoner's current mental state.  *See Panetti*, 551 U.S. at 960 (finding lengthy history of "gross delusions" were a relevant factor that should be considered in determining whether Panetti was currently competent for execution); *Simon v. Fisher*, 641 F. App'x 386, 390

---

[6]     *See also Green v. Thaler*, 699 F.3d 404, 418 (5th Cir. 2012) (holding that a prisoner must "know the fact of [his] impending execution and the reason for it" and also "[have a] rational understanding of the reason for the execution."); *Eldridge v. Davis*, 661 F. App'x 253, 257 (5th Cir. 2016) (unpublished) (approving a standard that seeks to determine whether the prisoner "has a present rational understanding of the fact of his crime, of his death sentence, and of the connection between his crime and death sentence.").

(5th Cir. 2016) (unpublished) (same).  But while a history of mental illness may be considered, the sole inquiry remains whether the prisoner's *current* mental condition allows him to rationally understand the reasons for his death sentence.  *Madison*, 139 S. Ct. at 728.

## III.  Evidence Presented

As mentioned previously, the Court held a three-day evidentiary hearing in October 2022 to determine whether Panetti is currently competent to be executed under the standard set forth above.  Panetti presented the following four witnesses:  (1) Dr. Stephen Marder, a psychiatrist, (2) Jacqueline Maenius, Panetti's younger sister, (3) Dr. Bhushan Agharkar, a forensic psychiatrist, and (4) Dr. Mark Cunningham, a forensic psychologist.  The State also presented four witnesses—three security guards from the Texas Department of Criminal Justice (TDCJ), and Dr. Timothy Proctor, a forensic psychologist.  Only two of the four experts presented by the parties had recently evaluated Panetti for execution competency—Dr. Agharkar (hired by Panetti) and Dr. Proctor (hired by the State).

**A.**     **Panetti's Evidence**

1.     Dr. Stephen Marder (1 EH 14-79)[7]

Dr. Marder is a licensed psychiatrist specializing in psychosis and schizophrenia.  *Id.* at 15. Because he is not a forensic psychiatrist, Dr. Marder did not conduct a forensic evaluation of Panetti or offer an opinion as to Panetti's competency for execution.  Instead, Dr. Marder testified as an expert on the diagnosis, course, and presentation of schizophrenia.  *Id*. at 15-18, 46, 77.

Dr. Marder explained that schizophrenia is a psychiatric syndrome that is characterized by psychotic symptoms.   These symptoms typically include delusions (fixed false beliefs),

---

[7]     Throughout this opinion, "EH" refers to the transcript of the October 2022 evidentiary hearing, and is preceded by volume number and followed by the relevant page numbers.  (ECF Nos. 329-331).  "PX" refers to Petitioner's exhibits, while "RX" refers to exhibits presented by Respondent.  (ECF No. 314).

disorganized thought processes, hallucinations, and impairments in motivation and cognition. *Id*. at 19-20. There is also a deterioration in functioning. *Id*. In most cases, schizophrenia is a chronic disorder which has an onset in the late teens or early twenties that, without treatment, will linger for the remainder of a person's life. *Id*. There is no laboratory test for diagnosing schizophrenia— it is a clinical assessment using a person's mental health history, medical records, and a psychiatric examination. *Id*. at 22-23. To meet the diagnostic criteria, a person must display at least one of the accepted symptoms along with a deterioration in functioning. *Id*. at 20.

Dr. Marder reviewed Panetti's records, including the reports of Dr. Proctor, Dr. Agharkar, and Dr. Cunningham, which indicated that Panetti's mental health issues began around the age of nineteen. *Id*. at 24-26. Over time, Panetti's psychotic symptoms worsened, and his functioning deteriorated. *Id*. He became more suspicious, disorganized, and delusional, and began experiencing auditory hallucinations. *Id*. Throughout the 1980s, Panetti was seen multiple times in various hospitals and found to be psychotic, and was often diagnosed as schizophrenic. *Id*.

Dr. Marder believes Panetti's delusional thinking and thought disorder have remained consistent over time, including during his 1995 trial and beyond. *Id*. at 18-19, 27, 38, 41, 67-68. For example, Panetti has consistently expressed delusions that he was possessed by evil spirits when he murdered his in-laws, that his conviction was a ruse to cover up a conspiracy in Fredericksburg, and that a listening device had been implanted in his tooth. *Id*. at 73, 76. Dr. Marder also believes that Panetti's schizophrenia lies "at the very severe end of the spectrum" and that Panetti would be unable to function and take care of himself if he were in the free world. *Id*. at 75.

For these reasons, Dr. Marder agreed with Dr. Agharkar's diagnosis that Panetti suffers from schizophrenia. *Id*. at 27. He also agreed that Panetti was not malingering or faking his

delusions.  *Id*. at 31, 34.  While it is possible for an individual to make up a delusion, it would be extremely difficult to mimic the severe disordered thinking that Panetti has consistently displayed for the past several decades.  *Id*. at 34, 77.

        2.      <u>Jacqueline Maenius</u> (1 EH 80-96)

Jacqueline Maenius is Panetti's younger sister by about four years.  *Id*. at 81.  As a child, Panetti was always eccentric and difficult to connect with on a personal basis, but she noticed a marked change in his behavior and demeanor as an adult following injuries he sustained while working on electrical lines.  *Id*. at 81-83.  Following the accident, Panetti was not as sociable and displayed a lack of ambition.  *Id*. at 83.  He was eventually diagnosed with  mental illness and declared disabled by the Social Security Administration.  *Id*. at 83-84.

Panetti subpoenaed Ms. Maenius to testify at his 1995 trial where he represented himself. *Id*. at 84-85.  He did not ask her any questions relevant to the case that may have helped him. Rather, it was as if Panetti called her to the stand just to talk with her and see how her family was doing.  *Id*.

Ms. Maenius still keeps in touch with her brother by writing.  *Id*. at 85-86.  She tries to keep him informed about what is going on in her life to hopefully bring some joy to his situation. His responses are usually very cryptic and hard to decipher, and sometimes contain scripture quotes all over the page.  *Id*. at 86, 91.  She also tries to visit him in person, but he is very difficult to communicate with because his thoughts jump back and forth and he is unable to maintain a line of thought.  *Id*. at 87.

During these visits, Panetti often speaks of experiences that she knows are not true.  *Id*. at 88-91.  For example, he told her that their childhood home was designed by Frank Lloyd Wright, and speaks often about appearing in various gangster movies.  *Id*.  He also talks about meeting

people he has never met—President Barack Obama, Supreme Court Justice Amy Comey Barrett, and actress Susan Sarandon, to name a few. *Id*. Ms. Maenius believes that many of these stories start with a nugget of truth, perhaps something he has read, but then get exaggerated and turned into delusions. *Id*. at 88-89, 91. Based on these conversations, she does not believe that Panetti understands that he is going to be executed. *Id*. at 95-96.

       3.    Dr. Bhushan Agharkar (1 EH 96-213)

Dr. Agharkar is a board-certified forensic psychiatrist hired to conduct a psychiatric examination of Panetti to determine his competency for execution. In both his clinical and forensic practice, Dr. Agharkar has diagnosed and treated numerous schizophrenic patients, including in a prison setting, and has conducted roughly twenty evaluations concerning competency for execution. *Id*. at 99-101. In conducting his evaluation of Panetti, Dr. Agharkar reviewed a voluminous number of records concerning his trial, medical history, social history, and family history. *Id*. at 102. He also interviewed Panetti on two separate occasions for a total of four-and-a-half hours. *Id*. at 104.

Dr. Agharkar diagnosed Panetti with schizoaffective disorder, bipolar type, which is schizophrenia in a person who has exhibited signs and symptoms of mania or depression. *Id*. at 107. He agreed with Dr. Marder that Panetti suffers from a severe form of schizophrenia that would prevent him from functioning normally in the free world. *Id*. at 108, 137. This diagnosis was explained further in Dr. Agharkar's report:

> Mr. Panetti has a long-documented history of psychotic mental illness. He has been diagnosed with Schizoaffective Disorder, Bipolar Type, and his clinical presentation is most consistent with this. He has a long history of hallucinations, delusions, and disorganized thinking, dating back to at least the 1980's. He exhibited severely tangential thought processes, flight of ideas, and looseness of associations. Mr. Panetti conveyed persecutory, grandiose, and somatic delusions which he clearly believes are real.

PX 87 at 12.

Dr. Agharkar compared interviewing Panetti to "trying to drink from a firehouse"—his responses were hyper-verbose and full of details, but not responsive to the question asked. 1 EH 119-20. Panetti exhibited pressured speech and disorganized thoughts throughout both interviews, both of which are symptoms of schizophrenia that are virtually impossible to fake. *Id*. at 115-17. Panetti's writing also displays hypergraphia, a condition analogous to hyperverbosity where his rambling thoughts fill every nook and cranny of a page. *Id*. at 118-19. Each demonstrates a disorganized mind. *Id*. Based on the consistency and severity of Panetti's disordered thinking, Dr. Agharkar concluded that Panetti was not malingering his impairments. *Id*. at 123, 160-61.

During the interviews, Panetti displayed several grandiose delusions that are consistent with what other evaluators have observed in the past. *Id*. at 123. In one, Panetti adamantly believes that the State wants to execute him to cover up a grand conspiracy he uncovered in Fredericksburg involving his in-laws, drug cartels, a pedophile ring, law enforcement, and the judicial system. *Id*. at 132, 135. In another, Panetti contends he is a prophet of God and speaks God's voice, and that the devil is using the State to stop him from preaching. *Id*. at 128, 134-35. Panetti believes that God will intervene and stop his execution, and that COVID, droughts, and hurricanes were all examples of God's displeasure with his persecution by the State. *Id*. at 127-28.

Based on the above, Dr. Agharkar concluded that Panetti was not competent to be executed under the *Ford/Panetti* standard. *Id*. at 105, 131; PX 87. Specifically, while Panetti knows he committed the murders and that the State intends to execute him, Dr. Agharkar found that Panetti's severe mental illness prevents him from rationally understanding *why* the State intends to execute him. *Id*. at 134-35, 182. According to Dr. Agharkar, Panetti's understanding of the reason for his execution is irrational—he believes the real reason is to cover up a convoluted conspiracy and to stop him from preaching the Word of God, rather than being due to murdering his in-laws, which

he believes is a front. *Id*. at 135, 154. Dr. Agharkar disagrees with Dr. Proctor's assessment that Panetti has a rational understanding of his execution simply because he is factually aware that he was convicted and sentenced to death for committing murder. *Id*. at 139-41, 154-55. To Dr. Agharkar, Panetti's severe mental illness and delusional thinking prevent him from understanding the causal connection between his crime and punishment. *Id*.

    4.    <u>Dr. Mark Cunningham</u> (2 EH 3-88)

Dr. Cunningham is a board-certified clinical and forensic psychologist who evaluated Panetti in 2004 and later testified at the September 2004 evidentiary hearing before the Honorable Judge Sam Sparks regarding Panetti's competency for execution. *Id*. at 12, 33. Dr. Cunningham was again asked to conduct an evaluation of Panetti but was unable to do so for health reasons. *Id*. at 28. As such, he was not asked to give an opinion on Panetti's competency, but rather to discuss Panetti's current mental state and evaluate the reports of the other experts. *Id*. at 28-29, 83-84. In doing so, Dr. Cunningham reviewed the reports and notes from the experts and the underlying data they reviewed before producing his own declaration. *Id*. at 29-30; PX 88.

Dr. Cunningham concluded that Panetti suffered from a severe schizophrenia spectrum disorder in 2004 and that he continues to suffer from that disorder today. *Id*. at 33-34. The core symptoms of this disorder include delusions (false beliefs), hallucinations, lack of motivation, flat affect, thought disorganization, and cognitive deterioration. *Id*. at 19-21, 27. These symptoms are relevant to a person's competency for execution because they interfere with the ability to achieve a rational understanding of the reason for their execution. *Id*. at 21-23. According to Dr. Cunningham, the greater the number of delusions a person has, the more difficult it will become to determine what is real. *Id*. at 23-25, 35.

Panetti has a number of "reality-based factoids" that relate to his execution: for example, he knows he is on death row at the Polunsky Unit, that he had a previous execution date in 2014, and that he represented himself at his 1995 trial. *Id*. at 24. But he also holds numerous "delusion-based factoids" that have no basis in reality. Among these, Panetti believes: (1) Justice Amy Comey Barrett visited death row at the Polunsky Unit, (2) his sister's house was designed by Frank Lloyd Wright, (3) a spirit inhabited him in 1992 and committed the murders, (4) he is a prophet of God, (5) he once bested Minnesota Fats at billiards, and (6) his first sexual experience was with actress Laura Dern. *Id*. at 24, 42-45.

Dr. Cunningham believes that Panetti's mix of "reality-based factoids" with "delusion-based factoids" creates a grave impairment in his ability to comprehend the world around him, including his execution. In addition, Panetti's severe thought disorder also deprives him of logic and linearity of thought, which inhibit his ability to rationally understand the reasons for his execution. *Id*. at 34-35. For these reasons, even though he has not recently evaluated Panetti in person, Dr. Cunningham gave the "qualified" opinion that Panetti was not competent to be executed. *Id*. at 69.

Lastly, Dr. Cunningham disagreed with Dr. Proctor's report for four reasons. First, Dr. Proctor appeared to believe that the only "delusion-based factoids" relevant to a competency evaluation are those specifically about the execution, which fails to recognize the impact that Panetti's numerous other delusions had on his ability to grasp reality. *Id*. at 47. Second, Dr. Proctor ignored Panetti's thought disorganization when evaluating his ability to rationally understand his execution. *Id*. at 47-48. Third, Dr. Proctor identified Panetti as being evasive on questions concerning his execution, when in fact Panetti's diseased mind lacks the ability to strategically withhold information. *Id*. at 48-50. And fourth, Dr. Proctor erroneously focused on

Panetti's factual awareness of his crime and impending execution rather than his rational understanding as required under the *Ford/Panetti* standard.  *Id*. at 51.

**B.**   **State's Evidence**

      1.   <u>Sergeant Matthew Ruble</u> (2 EH 89-98)

Sgt. Ruble is a security guard at TDCJ's Polunsky Unit where death row inmates, including Panetti, are housed.  He testified that he has known Panetti for almost three years and interacts with him roughly once a week.  These interactions are usually short and casual—nothing specific has ever stood out to him.  According to Sgt. Ruble, Panetti maintains his cell and personal hygiene better than most inmates, and mostly just reads or listens to the radio while in his cell.  He has never had a problem with Panetti in the three years he has known him, and is unaware of Panetti ever being referred for mental health concerns during that time.

      2.   <u>Sergeant Rachel Barker</u> (2 EH 99-105)

Sgt. Barker was also a security guard at the Polunsky Unit for around three years.  During that time, she spoke with Panetti almost daily, but the conversations were usually very brief.  Like Sgt. Ruble, Sgt. Barker did not recall Panetti ever saying anything odd or off the wall.  On one occasion, she transported Panetti to the hospital for a spider bite, but even then Panetti did not say anything that stood out to her.  In the three years she was there, Panetti was never a cause for concern.

      3.   <u>Sergeant Shawn Dorman</u> (2 EH 106-115)

Sgt. Dorman worked death row at the Polunsky Unit both as a corrections officer and later as a sergeant for a total of eight years.  During that time, he often spoke with Panetti, who would express odd beliefs to Sgt. Dorman every now and then.  For example, Panetti consistently expressed his belief that the FBI was after him, had bugged his cell, and had pointed red lasers at

him.  Panetti has also consistently yelled out bible verses and preached from his cell despite the fact that no one appeared to be listening.  But Sgt. Dorman never referred Panetti for a mental health intervention because Panetti wasn't hurting himself or others.  If anything, he believes Panetti has become a little calmer over the years.

       4.      <u>Dr. Timothy Proctor</u> (2 EH 116-227; 3 EH 3-111)

Dr. Proctor is a board-certified forensic psychologist whose practice largely consists of criminal cases where he has been asked to evaluate a person's competency.  2 EH at 119-20.  On average, Dr. Proctor conducts five or six competency evaluations a week, but has only evaluated three inmates for execution competency prior to this case.  *Id.* at 121.  In conducting his evaluation of Panetti, Dr. Proctor reviewed "thousands of pages" of records concerning Panetti's medical and social history, as well as Panetti's TDCJ records and trial transcripts.  *Id*. at 130-31, 188; RX 1 at 1-4.  He also interviewed Panetti in person for four hours the day before Dr. Agharkar conducted his own interview.  *Id*. at 143.

Like Dr. Agharkar, Dr. Proctor diagnosed Panetti with schizoaffective disorder, bipolar type, noting that Panetti exhibited many of the symptoms associated with this diagnosis.  *Id*. at 126-27.  These symptoms include delusions, hallucinations, disorganized speech and disorganized behavior, with Panetti's delusions and disorganized speech being "particularly noteworthy."  *Id.* During his evaluation, Dr. Proctor observed several of the delusions previously expressed by Panetti, including: (1) his belief that a recording device had been implanted in his tooth, (2) that Supreme Court Justice Amy Comey Barrett visited him on death row, and (3) his father-in-law was a pedophile who molested several members of his family, including Panetti's daughter.  *Id*. at 153-54.  Dr. Proctor concluded Panetti is "genuinely mentally ill" and not malingering the symptoms of his psychosis.  *Id*. at 129, 137, 152.

Despite Panetti's severe mental illness, Dr. Proctor believes he is competent for execution. *Id*. at 123; RX 1 at 42-44.  While he does not think Panetti was feigning mental illness, he noticed that Panetti was sometimes intentionally evasive when answering questions related to his competency for execution.  *Id*. at 129-30, 152; RX 1 at 42.  More importantly, Panetti did not connect his delusions to his impending execution.  *Id*. at 153-56, 173.  To Dr. Proctor, the issue in determining competency for execution is not simply whether someone holds irrational beliefs, but rather if his beliefs "specifically related to execution and the reason for such" are rational.  RX 1 at 42.  Although a delusion could render a person incompetent for execution, it would depend on whether there was a "more specific nexus" between the delusion and a person's rational understanding of the execution.  2 EH 155-57.  Because this is difficult to determine, particularly because a person's competency can fluctuate daily, an evaluator must consider the consistency of a person's delusions concerning his execution.  *Id*. at 158, 161-65, 185-87.

In this case, Dr. Proctor does not believe that Panetti has consistently expressed delusional beliefs that are specifically related to his execution.  *Id*. at 153-55, 173; RX 1 at 42-44.  While Panetti did report a delusional belief about uncovering a conspiracy theory involving his father-in-law and pedophilia, he did not link that delusion to his execution during his visit with Dr. Proctor. *Id*. at 153-55, 170-74, 203.  Instead, it was presented in terms concerning the fairness of his trial— Panetti believes this evidence was suppressed and should have been presented at trial.  *Id*.  He did not mention to Dr. Proctor his belief that he is being executed to cover up the conspiracy.  *Id*. Similarly, Panetti did not express his belief that the execution was a ruse to prevent him from preaching.  *Id*. at 170.  Although Panetti was certainly hyper-religious and believed he was sent to prison to preach the Gospel, he seemed to be referring to what he believed was his purpose in life, rather than the actual reason he was sentenced to death.  *Id*.

In sum, Dr. Proctor believes that, while Panetti evinced a belief that his trial was unjust because he was insane and evidence was suppressed, he is nonetheless aware that he was ultimately convicted and sentenced to death for murdering the Alvarados.  *Id*. at 168-69, 180-81;  RX 1 at 43-44.  In his opinion, this awareness is evidence that Panetti has both a factual and rational understanding of why he is to be executed.  *Id*.

## C.    Panetti's Rebuttal

The only rebuttal witness presented by the defense was Dr. Agharkar.  3 EH 111-153. Dr. Agharkar heard the above testimony and agreed with Dr. Proctor that delusions specifically related to the crime and impending execution are more relevant to determining execution competency than other delusions.  *Id*. at 126-27.  This is so because these delusions directly interfere and distort a person's rational understanding of the State's reasons for executing him.  *Id*.

However, Dr. Agharkar disagreed with Dr. Proctor's conclusion that Panetti has not consistently expressed delusional beliefs specifically related to his execution.  *Id*. at 128.  This includes Panetti's repeated assertion that he was insane at the time of the crime because evil spirits inhabited his body and committed the murders, as well as his belief that the real reason for his execution is to cover up the conspiracy he uncovered in Fredericksburg and to stop him from preaching the Word of God.  *Id*. at 128-31.  While the exact details of the delusions may change or grow over time, the overall theme of these persecutory and hyper-religious delusions have been around since the early 1990s.  *Id*. at 126, 132-33, 137, 148-49.

Dr. Agharkar also reiterated that a schizophrenia diagnosis does not automatically mean a person is incompetent to be executed.  *Id*. at 120.  Among those with schizophrenia, there is a spectrum of functionality and ability, with the most severe cases unable to maintain an organized thought or follow a thought to its logical conclusion.  *Id*. at 121.  All of the experts in this case

agree that Panetti is on the most severe end of this spectrum.  *Id*. at 113, 122.  And while the expression of Panetti's disordered thinking may vary from day to day, his mind is always disordered—the fact that he doesn't reiterate a certain delusional belief on any given day does not mean that he is less mentally ill that day.  *Id*. at 113-16.  In fact, that instability is a sign of an irrational mind and an incompetent person.  *Id*. at 118.

## IV. <u>Analysis</u>

In order to be considered competent for execution, Panetti must possess a factual and rational understanding of his crime, the impending execution, and the connection between his crime and the State's reasons for execution.  *Panetti,* 727 F.3d at 410.  To help make this determination, the Court has reviewed, among other things, the reports, notes, and testimony given by the four experts summarized in the previous section.  Unsurprisingly, all four experts agree that Panetti is a severely mentally ill person suffering from chronic schizophrenia, with symptoms at the very severe end of the schizophrenia spectrum.  The experts also agree that these symptoms—delusions, hallucinations, and disorganized thought processes—are genuine, and have consistently presented themselves throughout forty-plus years of Panetti's mental health history.  Because these symptoms are nearly impossible to fake, none of the experts believe that Panetti is malingering.

Alas, a unanimous diagnosis of schizophrenia does not end the inquiry into Panetti's competency for execution.  Because there is a spectrum of functionality among those with schizophrenia, it is possible for a person to be both schizophrenic and competent.  In such cases, the issue is not "whether a defendant is mentally ill, but the more subtle reaches of his disability." *Panetti*, 863 F.3d at 378.  But while psychiatrists, psychologists, and other experts can contribute to this Court's understanding of these mental health issues, the sole inquiry for the Court remains a legal one—whether Panetti is "so distorted by a mental illness" that he lacks a rational

understanding of his conviction, his impending execution, and the relationship between the two. *Madison*, 139 S. Ct. at 723.

This is where mental health professionals have long disagreed, including Dr. Agharkar and Dr. Proctor, the two most recent experts to have evaluated Panetti.  Dr. Agharkar believes that Panetti is incompetent for execution due, in part, to his delusional belief system, which is the product of severe mental illness and a cognitively impaired brain.  According to Dr. Agharkar, Panetti believes that he is to be executed because of a vast conspiracy against him, not because he murdered the Alvarados:

> Mr. Panetti believes the State of Texas wants him executed to cover up the incest, corruption, sexual abuse, drug trafficking, etc., he has uncovered in Fredericksburg and that the Devil has "blinded" the State of Texas and is using the State to kill him to stop him from preaching and "saving souls."

PX 87 at 13.  Panetti believes the State is using his murder conviction as a "sham" reason to execute him—the real reason is to cover up a conspiracy and to stop him from preaching.  Thus, while Panetti knows he is on death row and that the State intends to execute him, Dr. Agharkar does not believe he has a rational understanding as to *why* the State intends to execute him.

Dr. Proctor disagrees that Panetti's mental illness and delusional beliefs prevent him from rationally understanding the link between his capital offense and imminent execution.  While he observed many of Panetti's delusional beliefs, Panetti did not appear to link any of these delusions to his impending execution during his evaluation.  Instead, the delusions seemed to revolve around a feeling that his trial was unjust—Panetti believed that evidence concerning the Fredericksburg conspiracy was suppressed, and that he should have been found not guilty by reason of insanity. On the other hand, Panetti has consistently expressed an understanding that he was ultimately convicted and sentenced to death for killing the Alvarados.  To Dr. Proctor, this awareness that he

is on death row for murdering his in-laws equates to a "rational understanding of the connection between the crime and the punishment." RX 1 at 44.

After carefully considering the testimonies of Dr. Agharkar and Dr. Proctor, as well as the remaining testimony and numerous exhibits presented at the evidentiary hearing, the Court finds that the evidence weighs in favor of Dr. Agharkar's opinion—Panetti lacks a rational understanding of the reason for his execution.[8] Specifically, the record supports a finding that Panetti's well-documented mental illness, exacerbated by grandiose delusions and disorganized thought, prevent him from understanding the link between his crime and his impending execution.

During his interviews with Dr. Agharkar, Panetti expressed a strong belief that the State intends to execute him for two reasons: (1) to cover up the conspiracy he uncovered in Fredericksburg concerning pedophilia, corruption, and drug trafficking, and (2) to prevent him from preaching and "saving souls." In both, Panetti believes the devil has "blinded" the State of Texas and is using the State to kill him to achieve these goals. These firmly-held delusions directly demonstrate Panetti's inability to rationally understand the real reason for his execution—his murder conviction. To Panetti, his conviction is just a "sham reason" the State uses to justify his execution.

The State argues that, while Panetti has a long history of alleging there was corruption or a conspiracy in Fredericksburg, there is little evidence, other than Dr. Agharkar's testimony, that Panetti believes the corruption is related to his execution. (ECF No. 323 at 23). Instead, the State argues, they simply demonstrate Panetti's belief that his trial was unjust. But as explained by

---

[8]     Dr. Agharkar, whose qualifications and experience with execution competency evaluations are outstanding, offered an opinion most in accord with the Court's observations and review of the record. The Court notes, however, that each of the experts who testified were well qualified and offered credible, sincere opinions that the Court found invaluable. The fact that these experts all agreed on Panetti's underlying mental illness but ultimately disagreed on his competency only underscores the difficulty of the task at hand.

Dr. Agharkar and Dr. Marder, delusions sometimes drift and evolve over time.  1 EH 20-21, 113.
While the "kernel" of the persecutory delusion—that he is the victim of a grand conspiracy and
unfair trial—has remained largely the same since the early 1990s, it has evolved to include his
current belief that the State wishes to cover up the Fredericksburg conspiracy by executing him.  1
EH 176; 3 EH 126, 132-33, 137, 148-49.  Given this ability to evolve, the Court finds it unlikely
that Panetti's current conspiracy delusions are completely unrelated to his execution.[9]

In addition to his delusional beliefs, Panetti's severely disordered mind also undoubtedly
interferes with his ability to rationally understand the State's reason for executing him.  All of the
experts noted that Panetti's thought and speech disorganization made it nearly impossible for him
to follow a logical train of thought for more than two or three sentences.  1 EH 19, 120-21; 2 EH
34-35, 49, 74, 150-51, 208.  This inability to apply logic and linear thought necessarily impacts
Panetti's ability to understand the world around him, including his impending execution.  2 EH
69.  As explained by Dr. Cunningham, Panetti possesses "a globally diseased mind" with "poor
connection to reality-based information" that profoundly impacts his ability to make sense of
information.  *Id*. at 77.

Further, although the severity of Panetti's disordered thinking may vary from day to day,
his ability to comprehend the world around him is always limited because of his mental illness.  1
EH 118.  In other words, just because Panetti's symptoms are less apparent one day doesn't mean
that he is less mentally ill that day.  Panetti's mind is always severely disordered, and has been for
some time.  For this reason, the Court gives little import to the fact that Panetti may have expressed

---

[9]     Even if it was, Panetti's well-documented belief that he is being executed to prevent him from preaching is
unquestionably related to his execution.  *Panetti*, 551 U.S. at 955 (citing expert opinion that Panetti "believes in earnest
that the stated reason is a 'sham' and the State in truth wants to execute him 'to stop him from preaching.'"); *Panetti*,
727 F.3d at 403-04 (reiterating Panetti's belief, since at least 2004, that his execution was part of "a satanic conspiracy
to keep him from preaching.").

a particular delusion to Dr. Agharkar on one day but not to Dr. Proctor the next.  Indeed, this inconsistency is more evidence of an irrational mind and an incompetent person.

Finally, the Court disagrees with Dr. Proctor's assertion that Panetti's factual awareness of his conviction and sentence of death for murdering the Alvarados equates to a rational understanding of the reasons for his execution.  Because he appears to factually understand that he is to be executed and the State's stated reasons for such (his capital murder conviction), Dr. Proctor believes that Panetti necessarily understands the "causal link" between the two.  But a person's factual awareness of their conviction and sentence does not automatically mean they have a rational understanding of the State's rationale for execution.  Such an assumption "ignores the possibility that even if such awareness exists, gross delusions stemming from a severe mental disorder may put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose."  *Panetti*, 551 U.S. at 933. It also means that rational understanding may simply come down to whether a person mechanically answers a specific question in the right way—what Panetti calls the "sham" reason for his execution, for example—instead of considering this awareness of crime and punishment against the backdrop of the person's severe mental health issues.

In short, the Eighth Amendment demands more than a single thread of arguably rational thought in a sea of otherwise disorganized thoughts and delusions to establish that a person rationally understands the reasons for his execution.  And given the severity of Panetti's psychosis, the Court lack confidence in Panetti's ability to rationally understand much of anything, let alone the "causal retributive connection" between his crime and impending death in this case.  *Panetti*, 727 F.3d at 410.  Panetti is a deeply-disturbed, severely mentally-ill individual whose mental condition precludes him from accurately or rationally perceiving and interpreting the world around

him.  He has no capacity to understand or comprehend the State's rationale for his execution.

Therefore, the Court finds that Panetti is not competent to be executed for his crimes.

## V.  Conclusion

There are several reasons for prohibiting the execution of the insane, including the questionable retributive value of executing an individual so wracked by mental illness that he cannot comprehend the "meaning and purpose of the punishment," as well as society's intuition that such an execution "simply offends humanity."  *Madison*, 139 S. Ct. at 727; *Ford*, 477 U.S. at 407, 409.  Scott Panetti is one of these individuals.  It is undisputed that Panetti is severely mentally ill, suffering from chronic schizophrenia for over forty years.  As discussed in this opinion, the evidence before the Court also indicates that Panetti's mental illness prevents him from rationally understanding the State's reasons for executing him.  Thus, his execution would both "lack[] a retributive purpose and offend[] morality in the same circumstance."  *Madison*, 139 S. Ct. at 728-29 (citations omitted).

For these reasons, the Court finds that Scott Panetti is not competent to be executed under the prohibition against cruel and unusual punishment set forth by the Eighth Amendment.  As there is no further business before this Court, this case is also now **CLOSED**.

**SIGNED this 27th day of September, 2023.**

**ROBERT PITMAN**
**UNITED STATES DISTRICT JUDGE**